

*Assistant Attorney General*
*950 Pennsylvania Avenue, NW - RFK*
*Washington, DC 20530*

June 4, 2009

The Honorable Ed Emmett
County Judge
1001 Preston
Suite 911
Houston, TX  77002

　　　　RE:　Investigation of the Harris County Jail

Dear Judge Emmett:

　　　On March 7, 2008, we notified your office of our intention to investigate conditions at the Harris County Jail (Jail) pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997.  Consistent with statutory requirements, we write to report the findings of our investigation and to recommend remedial measures needed to ensure that conditions at the Jail meet federal constitutional requirements.  See 42 U.S.C. § 1997b.

　　　During our investigation, correctional experts in the fields of penology, medicine, psychiatry, and life safety, assisted us in reviewing records, interviewing staff, interviewing detainees, and inspecting facility living conditions.  Before, during, and after our on-site inspections, we received and reviewed a large number of documents, including policies and procedures, incident reports, medical and mental health records, and other materials.  Consistent with our commitment to provide technical assistance and conduct a transparent investigation, we provided debriefings at the conclusion of two on-site inspections conducted in July and August 2008.  During the debriefings, our consultants provided their initial impressions and tentative concerns.

　　　Throughout this process, County and Jail officials cooperated fully with our review.  We appreciate the assistance that they provided us and the candor of their response.  Indeed, we were impressed by the level of professionalism exhibited by staff at all levels and with the sophistication of many Jail systems.  While we use individual incidents throughout this letter to illustrate systemic deficiencies, we are aware that this facility has a very difficult task handling large numbers of

detainees, many of whom have serious medical and mental health problems. The examples we cite should not necessarily be construed as a criticism of particular staff. In many cases, such incidents may be more reflective of inherent systemic problems with Jail procedures or resources than the professionalism or dedication of staff and administrators.

We are pleased to advise you that Harris County Jail complies with constitutional requirements in a number of significant respects. The Jail's operational infrastructure includes the existence of written policies and procedures, clearly designated security and medical supervisors, training programs, a booking and intake assessment process, infection control programs, and fire safety precautions. At the same time, however, we also conclude that certain conditions at the Jail violate the constitutional rights of detainees. Indeed, the number of inmates deaths related to inadequate medical care, described below, is alarming. As detailed below, we find that the Jail fails to provide detainees with adequate: (1) medical care; (2) mental health care; (3) protection from serious physical harm; and (4) protection from life safety hazards.

## I.    DESCRIPTION OF THE JAIL

Harris County Jail includes four major jail facilities constructed between the 1980s and the 1990s. At the time of our site visit, the Jail housed over 9400 detainees.[1] The Jail's design capacity is reportedly 9800 detainees. The Harris County Sheriff's Department also places detainees at various satellite locations. If those detainees are also counted, the Sheriff's Department is responsible for a total of nearly 11,000 detainees. In 2007, the Jail processed over 130,000 admissions.

## II.   LEGAL FRAMEWORK

CRIPA authorizes the Attorney General to investigate and take appropriate action to enforce the constitutional rights of jail detainees and detainees subject to a pattern or practice of unconstitutional conduct or conditions. 42 U.S.C. § 1997. The rights of pre-trial detainees are protected under the Fourteenth Amendment which ensures that these detainees "retain at least those constitutional rights . . . enjoyed by convicted prisoners." Bell v. Wolfish, 441 U.S. 520, 545 (1979). Under

---

[1]    The Jail houses mainly pre-trial detainees, but also houses some post-adjudication inmates. For the purpose of this letter, both groups will be referred to as detainees.

the Eighth Amendment, prison officials have an affirmative duty to ensure that detainees receive adequate food, clothing, shelter, and medical care. Farmer v. Brennan, 511 U.S. 825, 832 (1994). The Eighth Amendment protects prisoners not only from present and continuing harm, but also from future harm. Helling v. McKinney, 509 U.S. 25, 33 (1993).

Detainees have a constitutional right to adequate medical and mental health care, including psychological and psychiatric services. Farmer, 511 U.S. at 832. Detainees' constitutional rights are violated when prison officials exhibit deliberate indifference to their serious medical needs. See Estelle v. Gamble, 429 U.S. 97, 102 (1976). Detainee living conditions must be "reasonably sanitary and safe." Farmer 511 U.S. at 832.

## III. CONSTITUTIONAL DEFICIENCIES

As a large urban detention facility, Harris County Jail faces a number of significant problems including a high detainee census and complex funding and logistical challenges. In many ways, the Jail actually performs quite well. Jail policies and procedures provide for a comprehensive detainee housing assignment process, medical sick call procedures, and regular facility maintenance. Staff receive broad training on Jail operations, supervision of detainees, and detainee rights. Unfortunately, in a number of critical areas, the Jail lacks necessary systems to ensure compliance with constitutional standards.

## A. Medical Care

The Jail has functional systems in place to provide medical care and treatment to a large population of detainees. These systems include an initial screening process, a more comprehensive health assessment for longer-term detainees, a sick call process, a modern clinic, qualified medical staff, a professional management structure, and mechanisms to obtain outside specialty care. Despite the general quality of such systems, the Jail fails to provide consistent and adequate care for detainees with serious chronic medical conditions. We found specific deficiencies in the Jail's provision of chronic care and follow-up treatment. These deficiencies, in themselves and when combined with the problems in medical record-keeping and quality assurance discussed below, are serious enough to place detainees at an unacceptable risk of death or injury.

1.  <u>Inadequate Chronic Care</u>

Detainees who suffer from chronic medical conditions require
assessment and ongoing treatment to prevent the progression of
their illnesses.  As part of the treatment process, detainees
with chronic medical conditions require routine follow up to
monitor the progression of their illness and the potentially
hazardous effects of medication.  Because of crowding,
administrative weaknesses, and resource limits, the Jail does not
provide constitutionally adequate care to meet the serious
medical needs of detainees with chronic illness.

Generally accepted standards of correctional medical care
require that medical staff identify detainees with chronic
conditions such as - diabetes, tuberculosis, and heart disease -
and provide timely treatment for such conditions.  Unfortunately,
the Jail does not have an assessment process to adequately
identify detainees with serious chronic medical conditions.  In
particular, we found that the Jail has delegated screening to
nurses who are in need of additional training and more
administrative oversight by physicians.  For instance, we found
assessment forms completed by nursing staff who had not actually
completed the assessments.  We also found that physicians do not
routinely see detainees with chronic conditions to assess the
status of their health.  Moreover, Jail staff do not conduct
periodic surveys of the housing units to identify detainees who
may have chronic medical conditions, but who may not necessarily
be identified by the normal sick call process or the screening
procedures conducted during detainee booking.  Such deficiencies
result in gaps in the system for identifying detainees with
serious chronic medical conditions.  For instance, staff may miss
some detainees who are degenerating mentally or physically, but
who are unable or unwilling to utilize the normal sick call
process.

Problems with chronic care assessments are particularly
pronounced in the assessment of detainees receiving medications.
Generally accepted correctional medical standards require that
once medical staff identify a medical condition, they need to
order appropriate medications and then periodically re-assess
those medications to determine their effectiveness and to monitor
side effects.  The Jail medical staff are not adequately

conducting such periodic assessments.  Examples from 2007-2008 include:

- Detainee AA had a history of hypothyroidism and seizures.[2]  Medical staff administered two medications, each of which could have had potentially toxic side effects.  After the initial medication order, dosages and blood levels of these medications were not monitored.

- Detainee BB suffered from a deep venous thrombosis (blood clot) in his lower extremity.  Medical staff administered an unsafe dosage of blood thinning medication, placing the detainee at an increased risk of clot formation.  Such clots can cause serious medical complications including sudden death.  Staff conducted lab tests which showed that the dosage might be unsafe, but then failed to follow up on the test results.

- Detainee CC had a history of heart failure.  Medical staff administered two medications with potentially toxic side effects.  Our record review suggests that medical staff did not check CC's blood levels for several months.

2. Inadequate Continuity of Medical Care

Chronic and some acute medical conditions require appropriate ongoing treatment and continuity of care.  Failure to address detainee medical conditions over time can lead to an increased risk in morbidity and mortality.  Systems and practices, such as adequate record-keeping and follow-up exams by qualified staff, must be in place to manage the serious medical conditions of detainees during the length of their incarceration.  The Jail does not have a system in place to provide such continuity of care for some of the detainees with the most serious medical conditions.

The Jail's medical clinic serves as a makeshift emergency room, stabilizing detainees with acute conditions.  This model, however, is problematic in a large urban detention facility with

_____

[2] To protect the identity of detainees, the initials used in this letter are not the actual detainees' initials.

hundreds of sick detainees.  Many of the detainees with serious medical conditions cannot be adequately identified or treated solely through an acute care process.

In the absence of a chronic care program or other systems for ensuring follow-up care, the sick call process serves as the primary mechanism for the Jail to provide continuity of care. This system is not capable of providing such continuity of care. The sick call process itself is seriously strained due to crowding, staffing limits, and some problematic practices.  For instance, we received a number of complaints about delays in care at the Jail's 1200 Baker facility.  Because of the way care is organized at the Jail, the 1200 Baker housing units seem to be particularly affected by any bottlenecks in access to the main intake clinic, despite the fact that the clinic is also located at 1200 Baker.  Because the main clinic also serves as the main intake facility and emergency treatment center, the 1200 Baker detainees must effectively share the same clinic resources as newly admitted detainees, emergency cases, and detainee transfers from other units who require additional medical supervision. This puts a heavy strain on 1200 Baker medical staff and impedes detainee access to care.

More generally, the Jail's administrative procedures allow delays in care to be easily overlooked.  Jail procedures require that detainees complete forms to request medical care.  The Jail disposes of these forms, however, just after they are processed. Once the forms are destroyed, the Jail apparently cannot track detainee requests for medical care in order to determine whether they have been fulfilled.  Another peculiar Jail practice involves the process for responding to requests for specialty care.  As a matter of routine practice, Jail detainees submit requests for specialty care to a clerk.  This process has apparently little or no physician oversight, which means that access to specialty care is not initially reviewed by qualified personnel.  This lack of oversight means that individuals who may need more intensive or immediate care receive the same level of attention as those with relatively low priority needs.

These problems would be troublesome enough for a clinic dealing only with detainees who have acute medical complaints. For detainees with chronic conditions, barriers to care can cause them more difficulties than experienced by those inmates with more typical medical complaints.  Detainees with chronic illness may need care to be much more timely and routine than some detainees with acute conditions.  At present, however, the detainees have a difficult time first accessing the clinic, and then receiving continuity of care.  Detainees with mental illness

are an especially high risk group.  Other detainees with chronic conditions may at least have the capacity to seek care. Detainees with mental illness, especially those who are acutely psychotic or suicidal, may not even try to use the sick call process to obtain continuing treatment of their conditions.  Such detainees may need regular follow-up visits and more consistent access to medical staff.

Examples of the Jail's failure to provide appropriate follow-up treatment and continuity of care include the following examples from 2007-2008:

- DD was a 74-year-old detainee with a history of open heart surgery.  When DD visited the clinic presenting complaints of incontinence, medical staff failed to give DD a physical exam or take his vital signs.  Staff sent DD back to DD's unit.  The following day, DD returned to the clinic with incontinence and elevated blood pressure.  Clinic staff sent DD to the hospital, where he died shortly thereafter.

- EE had a documented history of diabetes that received inadequate medical attention.  When EE complained of symptoms, staff merely prescribed pain medication. Initially, EE complained of leg pain and knee swelling. In response, staff provided EE with pain medication. EE complained again 5 days later about her symptoms. The medical notes were essentially illegible, but apparently staff again just provided pain medication. The detainee complained of her symptoms once more that same day.  While waiting to be seen in the clinic, EE collapsed and died shortly afterwards.  The documentation suggests that after EE collapsed, staff failed to provide an appropriate emergency response. For instance, the records show that EE had a low blood sugar level at the time of her collapse, but staff failed to respond to the symptoms.  Medical records also suggest that the staff did not try to use an automatic emergency defibrillator during the incident.

- FF had a history of cirrhosis. Over several weeks, FF's liver condition worsened, but staff repeatedly failed to respond in a manner consistent with generally accepted correctional medical standards.  FF initially presented to the clinic with a complaint of swelling to his legs.  Jail staff prescribed blood pressure medication, even though FF's blood pressure was normal. FF complained of chest pain and other conditions over

the next several weeks.  Jail staff repeatedly sent FF
to the hospital but repeatedly failed to change his
medications, treatment plan, or conduct other
appropriate follow-up.  For instance, on one of these
occasions, a deputy reported that FF was having trouble
walking.  The staff sent FF to the hospital, and an
undated medical note indicates that FF needed fluid
removed from his stomach.  Again, however, staff did
not alter FF's treatment plan; nor was there any
apparent documentation of vital signs.  Approximately
one month after his initial complaint, FF died during
his last hospital stay.  One troubling additional note
about this case is that during the period in question,
FF apparently spent much of his time at the Jail in a
housing unit instead of the infirmary.  Given the
seriousness of FF's medical condition, he needed to be
in an infirmary in order to receive the level of care
required by generally accepted correctional medical
standards.  The discontinuity of care and a lack of
follow-up by staff are of serious concern in this case.

3.  <u>Inadequate Medical Documentation and Quality Assurance</u>

Medical record-keeping and quality assurance are basic
components of a clinical practice that is consistent with
generally accepted correctional medical standards.  These systems
help identify and correct potential problems with patient care.
Harris County has deficiencies in both areas, and these
deficiencies contribute to problems with chronic care and
continuity of care.

A complete and adequate medical records system is critical
to ensuring that medical staff are able to provide adequate care.
The Jail's process for maintaining medical records and processing
medical orders often leaves medical records unavailable to nurses
and doctors.  Medical staff have little or no access to the
records when the pharmacy staff are filling out medication
orders, because the pharmacy staff have custody of the records
when completing those orders.  During our fact-gathering, we also
found various record-keeping problems such as a lack of
compliance with professional record-keeping formats, illegible
physician notes, and factually inaccurate documentation.  These
deficiencies affect the quality of care and the medical staff's
ability to meet Constitutional requirements.

As a matter of technical assistance, we should note that
correctional facilities often benefit from having an adequate
quality assurance process.  Such a process can help

administrators self-identify and correct any deficiencies.  A
large facility may have particular difficulty addressing systemic
constitutional deficiencies without such a process.  The Jail
does engage in some effective quality improvement activities in
order to track and trend medical-related incidents at the
facility.  The activities do not, however, include adequate
mechanisms to review and evaluate Jail physicians; nor does the
process include mechanisms that could help ensure more consistent
and adequate record-keeping.  The mortality review process does
not include feedback to appropriate physician staff.

B.  Mental Health Care

     Many of the Jail detainees require mental health care.
Approximately 2000 Jail detainees reportedly receive psychotropic
medications each day.  Of the detainees receiving psychotropic
medications, approximately 200 are considered by the Jail to be
part of the mental health program.  These detainees often cannot
be housed in general population because of their mental health
condition.  The Jail needs a range of housing options to handle
such detainees, because detainees with mental illness have very
different needs depending on their circumstances.  Instead, the
Jail only has a limited number of on-site housing options for
detainees with mental illness.  These basically consist of some
single cells and specialized dormitories.

     Housing practices for detainees with mental illness are
problematic.  For example, even though the ratio of male to
female mental health patients is about 2:1, the number of male
single cells to female single cells appears to be 32:1.  Thus,
female detainees with mental illness are much more likely to be
left in inappropriate housing conditions while awaiting care.  As
with medical care generally, the clinic in the 1200 Baker
building serves as the primary mental health resource.  As noted
previously, the 1200 Baker clinic is overwhelmed.  The Jail also
has access to some other treatment facilities, such as the Harris
County Psychiatric Center (Center), but these facilities have
limited resources.  For example, the Center can house only 24
Jail detainees.

     Many of the problems noted previously regarding chronic care
and medical care generally also apply to detainees with mental
illness.  For example, the Jail's process for assessing and
treating detainees is focused on acute symptoms and does not
adequately identify detainees with serious mental health needs.
The mental health clinic functions like a hectic emergency room,

and detainees with serious mental health conditions often cannot obtain timely and appropriate care. These deficiencies violate generally accepted correctional mental health standards.

As a practical matter, while the general medical clinics can meet the serious acute care needs of many detainees, the mental health system does not adequately address the serious mental health care needs of detainees. Mental health policies designed to cover a range of conditions exist, but overwhelmed staff often do not implement them as written. A host of serious mental health conditions cannot be adequately handled at the Jail because of significant housing and treatment limitations. While the Jail devotes additional resources to dealing with the most acutely suicidal, even the basic care and supervision of the most seriously mentally ill appears inadequate.

1.  Inadequate Access to Mental Health Treatment

The Jail's written policies include a process for screening and prioritizing detainees with serious mental illness, but in practice, the Jail does not adequately treat detainees based on the seriousness of their condition. The Jail staff classify requests for mental health care into four basic categories. Category 1 includes detainees who are acutely suicidal or have expressed homicidal complaints. Category 2 includes detainees who have expressed some suicidal ideation but have not indicated imminent action. Category 3 includes detainees with medication issues. Category 4 includes detainees who need to see a case manager. Because of limitations on facility housing, staffing, and treatment options, the Jail can only address detainees in Category 1. Other detainees must wait for treatment, often for significant periods of time, if they receive mental health treatment at all.

Given that mental health staff received about 17,000 requests in 2007, the existing system for allocating mental health resources is inadequate. The Jail does not provide access to mental health care for many inmates with serious needs. Examples from 2007-2008 include:

•   GG entered the facility with a mental health history. At the time, GG apparently was withdrawing from alcohol, but staff failed to provide appropriate medication and initial intervention. Five days later, someone observed GG in his cell, with blood seeping out under the door. Security arrived, and they discovered that GG had lacerated his hand and appeared to be hallucinating. Staff transferred GG to the infirmary,

but they did not complete an initial psychiatric assessment until five days later. Staff discharged GG two days later.

- HH's medical record suggested that he had a history of not eating, but staff did not initially refer him to a psychiatrist for assessment. After six months in the Jail, HH complained of depression, and staff finally referred HH to a psychiatrist. Mental health staff, however, did not conduct an initial psychiatric evaluation until three weeks after HH complained of depression. Mental health staff noted that HH appeared to be depressed. During the next two months, HH received medication but did not see a psychiatrist. HH ended up in an altercation and had to be placed in isolation. Two days later, he began vomiting blood. At the time of our tour, HH had been housed in administrative separation for more than 18 months and had been involved in various altercations with staff. Given the nature of HH's mental health condition, the Jail's delays in providing mental health treatment and evaluation likely contributed to HH's continuing mental decline and behavioral disturbances.

- II entered the Jail with a history of seizures, but apparently did not receive seizure medications at intake. II experienced a seizure 19 days after arrival at the Jail. II also had a history of cutting. There was no follow-up on this psychiatric issue at all.

- JJ served time in the Jail on multiple occasions. Staff medicated JJ without following generally accepted correctional medication standards. Without an initial screening, the Jail staff involuntarily medicated JJ and housed him in the mental health department's acute treatment cellblock. Staff then repeatedly treated JJ with both anti-psychotic and mood-stabilizing medications without adequate laboratory studies or proper monitoring, placing the detainee at risk of sudden death.

- KK was identified as bipolar upon admission. Psychiatry did not see KK for nearly a month, and KK received no medication for his illness until about six weeks after his admission. In the interim, KK was involved in altercations on four occasions, resulting in the fracture of his arm. Staff renewed KK's medication order over this period without further

patient examination by a psychiatrist. Even after KK's altercations, there appears to have been little follow-up by staff to deal with KK's mental health symptoms.

• During intake, LL reported a mental health history that included risk factors for suicide. The Jail staff did not refer LL to mental health services. Approximately 3 weeks later, LL lacerated his neck.

2. Inadequate Treatment and Psychotropic Medication Practices

In a large urban detention center with a heavy mental health caseload, staff need to have access to a variety of treatment resources. Such resources include an array of different types of therapy, medication, and intensive supervision in order to address different types of mental illness, and varying levels of patient acuity.

Jail mental health staff have access to some mental health resources, but those resources are not sufficient given the size of the mental health caseload. The Jail has few treatment program options available for detainees with mental illness. The Jail uses medications, additional staff monitoring, and some structured housing for detainees with mental illness. For most mental health conditions, the primary intervention is a medication order, often with inadequate follow-up even for the most seriously ill. Indeed, once medical staff prescribe medications, they often cannot or do not routinely follow-up on those detainees unless the detainees themselves request care. This is a substantial departure from generally accepted correctional standards. Notably, detainees also reported that there are significant delays when they request care.

In our document review, some of the treatment orders appeared to depart significantly from generally accepted professional mental health standards. Some of these orders suggest that staff may be utilizing medications in a clinically inappropriate or unsafe manner. Examples of improper chemical restraints and unsafe medication practices during the period from 2006-2008 include the following:

• MM was in an acute psychotic state for nearly two weeks before he died. At intake, staff prescribed medications but they were never dispensed. As MM became increasingly uncooperative, staff injected MM with an intramuscular drug. Medical records suggest significant problems with basic medication

documentation and staff approaches to medication non-compliance. Soon after MM was injected, MM's breathing grew shallow, and he became unresponsive. MM died shortly afterwards.

- NN spent the better part of a year in a State Hospital. NN was found not competent and not restorable. For some reason, he was sent back to the Jail. Despite his competency status, Jail staff nevertheless placed the detainee in general housing and allowed him to keep various medications on his person. NN was not a good candidate for self-medication. NN appeared to suffer a seizure and he was sent to the clinic. The clinic staff suspected the detainee was "sleepy" due to his psychotropic medications. They released the detainee from the clinic, and he died shortly afterwards.

- A Jail psychiatrist diagnosed OO with schizoaffective disorder (a situation where both mood and schizophrenic symptoms exist). OO also had a history of mental illness. OO's mental health deteriorated, and staff repeatedly renewed his medications without having him seen again by a psychiatrist. OO ended up in two altercations, including one in which he struck a deputy.

- PP reported a history of seizures. PP suffered at least one seizure in the Jail, but according to the Jail's medical records, there was no proper follow-up. Medical staff placed PP on four benzodiazepines, but not a long-term anti-convulsant.[3] This suggests that the purpose of the medications prescribed was more likely to sedate the inmate, rather than to treat his seizures.

- QQ required treatment for seizures. QQ experienced a series of seizures, but on at least two clinic visits, documentation suggests that QQ's chart was unavailable

---

[3] If used at all for seizure disorder, benzodiazepines are typically prescribed for short-term treatment. They are more commonly used for acute detoxification. In the context of this individual's history and record, the use of four medications of the same class to sedate a detainee appears to be a misuse of the medications.

to the staff during the exams.  This resulted in a
number of delays in care despite QQ's repeated
seizures.

3.  <u>Inadequate Suicide Prevention</u>

In general, a comprehensive system for providing adequate
mental health care should also include policies, procedures and
practices to prevent detainee suicides.  Because suicide
prevention is itself an important legal concern, we note
specifically that the Jail has a number of conditions that are
dangerous for suicidal detainees.

First, the Jail lacks adequate video surveillance and
supervision in various holding areas.  Some of the cells used for
housing newly arrested detainees include unsafe physical fixtures
(<u>e.g.</u>, exposed bars) that can be used to facilitate suicide.
While the Sheriff's Department was in the process of retrofitting
these cells during our tour, such efforts need to be broadened.
Many of the mental health holding areas throughout the Jail
appear to be clinically inappropriate.  For instance, padded
rooms in administrative separation and maximum security units are
difficult to supervise and the conditions are so stark, they can
cause a detainee with mental illness to degenerate.

Second, the detainees' generally limited access to mental
health care can be especially dangerous for suicidal detainees,
since suicidal detainees may not be particularly inclined to seek
care on their own.  Thus, adequate screening and pro-active
efforts to identify and treat suicidal detainees are necessary to
ensure compliance with minimum standards of care.

C.  <u>Protection from Harm</u>

We evaluated the Jail's detainee supervision procedures,
security classification process, housing practices, grievance
procedures, disciplinary process, and training program.  We found
that many Jail policies and practices are consistent with minimum
correctional standards.  Yet, at the same time, we also found
some significant and often glaring operational deficiencies.  For
security matters in particular, the Jail lacks:  (1) a minimally
adequate system for deterring excessive use of force, and (2) an
adequate plan for managing a large and sometimes violent detainee
population.

1.    <u>Excessive Use of Force</u>

        We have serious concerns about the use of force at the Jail.
The Jail's use of force policy is flawed in several regards.
First, neither written policy nor training provide staff with
clear guidance on prohibited use of force practices.  For
example, Harris County Jail does not train staff that hogtying
and choke holds are dangerous, prohibited practices.  Indeed, we
found a significant number of incidents where staff used
inappropriate force techniques, often without subsequent
documented investigation or correction by supervisors.  Second,
use of force policies fail to distinguish between planned use of
force (<u>e.g.</u>, for extracting an detainee from a cell) and
unplanned use of force (<u>e.g.</u>, when responding to a fight).  In
many planned use of force situations, staff should be consulting
with supervisors, and possibly medical staff, before using force.
Third, Jail policies do not provide for routine videotaping of
use of force.  Fourth, the Jail does not have an appropriate
administrative process for reviewing use of force.  Jail policy
does not clearly require the individual using force to file a use
of force report; nor does Jail policy provide for routine,
systematic collection of witness statements.  When supervisors
review use of force incidents, they do not have ready access to
important evidence.  Instead, they appear to rely excessively on
officer statements to determine what happened during an incident.
While Jail staff were helpful and willing to assemble use of
force documents requested by our review team, we found it
troubling that the Jail did not collect such documents as a
matter of course.  In other words, use of force occurs at the
Jail without adequate review, and Jail data regarding use of
force levels cannot be considered reliable.  We believe that the
incidents noted during our review may only reflect part of what
is really occurring within the facility.

        As a result of systemic deficiencies including a lack of
appropriate policies and training, the Jail exposes detainees to
harm or risk of harm from excessive use of force.  In a
particularly troubling January 2008 case, staff applied a choke
hold to a detainee, who subsequently died.  The autopsy report
identified the manner of death as homicide.  Our review of the
Jail's records suggests that such improper force technique is
being used with troubling frequency.  For instance, our
consultant found a pattern of such incidents when reviewing use
of force reports dated from January through June 2008.  These
incidents included the following:

        •       An officer reported that he "grabbed inmate RR by the
                front of his jumpsuit top and the back of his neck and

forcibly placed inmate RR on the ground.  Once on the ground, I continued to apply pressure to inmate RR's neck and placed my right knee in the small of his back."

- An officer used both a headlock and multiple strikes to SS's rib cage.

- Officers "grab[bed] the front of [TT's] shirt and place[d] him on the wall to gain control of the incident."

- Officers used force on UU that resulted in a laceration requiring eleven staples to the scalp.  Yet, the use of force incident was not reported by either of the officers who applied the force.  Instead, another officer initiated the "inmate offense report."

These and other similar incidents suggest that staff use hazardous restraint and force techniques without appropriate guidance or sanction.  In some cases, medical records confirm that detainees may have suffered notable injuries, such as lacerations to the scalp or eye.  Notably, when force was investigated by supervisors, it appears that the supervisors often determined that staff's use of force was appropriate without obtaining independent medical review or multiple witness statements.

At the time of our inspection, the Jail was already making some effort to improve use of force reviews.  At the time of our tour, the Office of the Inspector General was in the early stages of developing a use of force review process.  We also understand that the Jail continues expanding this process in ways that may address some of the concerns noted in this letter.  Nevertheless, work must continue in this area before we can conclude that the Jail meets minimum constitutional standards.

2.  <u>Overcrowding</u>

With a population approaching 10,000 detainees, the Jail is one of the largest detention facilities in the country.  The Texas Jail Commission's decision to grant the County waivers to house approximately 2000 detainees more than the Jail's original design capacity is concerning on its face.  At the same time, however, a large detainee population, even if over design capacity, does not itself necessarily violate minimum legal standards.  Moreover, the Sheriff's Department has adopted a number of measures to alleviate crowding issues, such as

transferring detainees to outside facilities and providing "portable bunks." Conditions would likely be much worse if the detainees at outside contract facilities had to be housed in the Houston Jail complex. The Sheriff's Department is clearly trying to manage its population, and we acknowledge its efforts. While crowded conditions may not, in and of themselves, violate the Constitution, we are compelled to raise our concerns here because (1) the Jail's crowded conditions currently exacerbate many of the constitutional deficiencies identified in this letter; and (2) the Jail needs a more comprehensive, systemic approach to dealing with a large and growing Jail population.

Jail crowding affects multiple Jail systems. For instance, it impedes detainee access to medical care, indirectly affects detainee hygiene, and reduces the staff's ability to supervise detainees in a safe manner. How the Jail handles inmate supervision and violence illustrates some of the complexities associated with overcrowding. The Jail has already adopted a number of useful strategies for dealing with detainees who are dangerous to themselves or others. These strategies include an objective classification process for deciding where to house detainees and contracts with outside facilities to handle crowding pressure. Despite such strategies, the Jail is so large, violence still breaks out frequently. In one recent ten month period, the Jail reported over 3000 fights, and 17 reported sexual assaults. Also, as discussed above in the mental health section of this letter, the Jail has had particular difficulty managing violent detainees with behavioral and mental health issues. Because crowding makes it difficult to supervise detainees and prevent violence, additional Jail staffing or more jail diversion programs could reduce the risk of detainees coming to harm in the facility.

Managing a large population is a complex problem, and requires both short-term administrative approaches and long-term strategies. For instance, changes to administrative processes and better technology can help alleviate violence and supervision problems associated with crowding. The Jail staff have limited options to address violence and other serious incidents through internal administrative and supervisory mechanisms. At the time of our tour, the Jail did not have the ability to routinely investigate violent incidents. Instead, the Jail staff had to rely heavily on more cumbersome criminal prosecutions to deal with such incidents. In such a large facility, criminal prosecutions may not be a sufficient deterrent to violence. More structured administrative procedures for reviewing incidents, identifying dangerous inmates, and correcting hazardous situations are needed. The Jail also did not have procedures in

place that could more appropriately distinguish between disturbances caused by detainees with mental illness and other detainees. The response to the former often needs to be more nuanced in order to avoid exacerbating the detainees' mental illnesses and to ensure fairness. Instead of referring detainees for structured treatment, the Jail staff instead often have to rely on placing detainees with mental illness in isolation. Isolation can actually make a detainee with mental illness worse and is not as therapeutic as a properly designed, dedicated treatment unit. Other administrative deficiencies include a lack of staff control over hazardous contraband (e.g., detainee razors), and a disciplinary process that lacks safeguards to protect witness confidentiality. Similarly, physical plant and technology issues affect the Jail staff's ability to supervise housing areas. The four main facilities do not have video surveillance in critical areas. The satellite facilities also lack adequate video surveillance.

More generally, while clearly the use of outside facilities and other tactics have helped to alleviate some of the population pressures at the Jail, it is less clear whether the Jail actually has a workable long-term plan for dealing with the types of systemic problems noted in this letter, especially in light of potential population growth. The County is reportedly working to address many of the specific issues raised in this letter, but at this early remedial stage, it is difficult to determine how much progress will eventually be made. For instance, if the Jail increases staff, but then the Jail population simultaneously increases, those staff could quickly become overwhelmed. In other words, when dealing with crowding and its effects on security, medical care, and various Jail operations, the Sheriff's Department should evaluate issues and remedies in a systemic manner. Otherwise, it may be much more difficult to resolve deficiencies in a complete and long-term manner.

D. Sanitation and Life Safety

The Jail buildings are generally modern and adequately maintained. Staff receive training on a variety of emergency procedures. The Jail lacks, however, certain necessary structured maintenance, sanitation, and fire safety programs. Given stresses upon Jail infrastructure crowding, the lack of such programs raises concerns about sanitation and fire safety in the Jail.

1. <u>Sanitation and Hygiene</u>

While the Jail generally appeared to be clean and many systems seemed to be well-maintained, certain deficiencies in the Jail's hygiene practices and maintenance programs expose detainees to an unacceptable risk of injury, disease, or other harm.  Jail crowding contributes to these deficiencies.

First, the Jail does not have systems in place to ensure adequate detainee personal hygiene.  For example, the facility's laundry facilities and procedures are currently inadequate given the size of the Jail population.  As a general matter, the Jail does not even have a "par level" of clothing or linen available for detainees.  In other words, the Jail does not maintain enough accessible clothing or linen on-hand for the number of detainees housed at the facility.  Moreover, the laundry operation does not meet minimum sanitary standards.  The laundry operation does not properly wash and sanitize clothing.  The laundry has only a few machines, and a number of those were inoperative during our tour.  The staff also use a variety of inconsistent, and often inadequate, schedules and procedures for handling and cleaning laundry.  As a result, we found a significant amount of unsanitary bedding, clothing, and mattresses throughout the facility.  Such unsanitary conditions can expose detainees to a serious risk from infectious disease.

Another example of poor hygiene practices involves detainee grooming and shaving equipment.  The Jail's barbers practice their trade in an unhygienic manner.  Clipper blades, guards, and supply boxes appeared to be dirty and had not been cleaned between uses.  Detainee barbers did not keep their equipment in disinfectant solutions.  As discussed previously in this letter's section on protection from harm, razor blades are not well controlled in the facility.  The availability and use of dirty, shared razors and blades is a serious risk, both in terms of disease transmission and as a security matter.

Finally, the Jail's plumbing and mechanical systems require improved maintenance in order to ensure hygienic conditions in certain housing units.  While most of the Jail is properly maintained, the Jail's population size and gaps in the Jail's maintenance program result in unsanitary conditions in the intake and mental health units, where the Jail utilizes archaic flush-able floor drains, essentially holes in the floor, instead of toilets.  Using such grossly inadequate facilities for long periods of time is itself problematic because they are

unhygienic.  Moreover, when we tested some of the drains, they
back-flushed into the cells.  Elsewhere throughout the Jail, we
found drains clogged with significant accumulations of debris.

    2.  <u>Fire Safety</u>

    The Jail is a modern facility with a number of fire safety
features, such as alarm systems and fire suppression equipment.
The main problem with the Jail's fire safety program is that
staff training and oversight appear to be inadequate.  During our
site inspection, we found inadequate numbers of personnel trained
to perform emergency tasks.  The Jail has a level of constant
staff turnover that makes it difficult to ensure that there are
fully trained staff on duty in the housing units.  As a result,
when we randomly questioned staff about emergency procedures, we
found that a number of them did not know how to use emergency
equipment or how to respond during a drill.  We also discovered
inconsistencies in safety documentation that further suggest a
lack of staff training.  Finally, we found that the Jail staff
did not have adequate access to emergency keys in the event of a
failure in the Jail's electronic door control system.
Commendably, the Sheriff's Department immediately took a number
of steps to address our fire safety concerns.  Importantly, these
efforts should be incorporated into ongoing, system-wide safety
reviews.

## IV.  RECOMMENDED REMEDIAL MEASURES

    In order to address the constitutional deficiencies
identified above and protect the constitutional rights of
detainees, the Jail should implement, at a minimum, the following
measures in accordance with generally accepted professional
standards of correctional practice:

A.  <u>Medical care</u>

1.    The Jail should develop a chronic care program consistent
    with generally accepted correctional medical standards.
    This program should include a process that will identify
    detainees who should be enrolled in a chronic care program;
    a roster of detainees enrolled in the program; a schedule of
    medical visits for each detainee enrolled in the program; a
    system for determining which diagnostic tests will be
    required for each chronic condition; and record-keeping
    which includes documentation of lab work and medical orders.

2.    The Jail should update and improve the medical and mental
    health quality assurance and training programs to ensure

compliance with generally accepted correctional medical standards. These improvements should include additional internal self-auditing to ensure that staff conduct appropriate assessments, provide timely treatment, and document care in a manner consistent with generally accepted correctional medical standards.

3.  The Jail should develop a system to monitor the effects of medications and to ensure appropriate follow-up for detainees with serious medical or mental health conditions.

4.  The Jail should develop a system to track sick call requests and identify barriers to timely access to medical or mental health care. Sick call requests need to be triaged by appropriate personnel to ensure appropriate and timely access to medical care.

5.  The Jail should ensure that medical consultation and specialty services receive physician oversight.

6.  The Jail should employ sufficient qualified staff to ensure detainees have adequate access to medical and mental health care.

B.  <u>Mental Health Care</u>

1.  The Jail should create a mental health program that will allow the Jail to identify, treat, and monitor detainees with chronic mental illness. As part of this development process, responsible Jail personnel may wish to consider evaluating mental health programs in a variety of outside institutions and adopt useful policies and procedures from appropriate models.

2.  The Jail should continue with efforts to assess the mental health caseload in the facility, and develop a variety of housing and treatment options to address the needs of the mentally ill. This system will need to organize treatment options so that the Jail can deal with those across the entire spectrum of care. The Jail's mental health treatment policies need to meet generally accepted standards of correctional health care. These policies should provide for the development of individual treatment plans and timely access to levels of care appropriate to detainees' mental health needs. Such care should address detainees who are stable and can be housed in general housing, detainees who are highly unstable and require intensive supervision, detainees who are stable but may require step-down services

before returning to general population, detainees who are actively suicidal, and detainees who are at risk of suicide but may not have expressed an immediate intent to commit suicide.

3.   Restraints should not be used as punishment, for the convenience of staff, or in lieu of treatment.  The Jail should provide a variety of psycho-therapeutic treatment options and adopt appropriate safeguards to avoid the inappropriate use of chemical sedation.

4.   The Jail should implement policies for monitoring detainees at risk of suicide that meet generally accepted correctional mental health standards.  The Jail should retrofit cells used for suicidal detainees or detainees requiring intensive supervision.  The Jail should eliminate fixtures that can be used to facilitate suicide (<u>e.g.</u>, exposed bars or bath fixtures) while at the same time avoid creating a non-therapeutic environment (<u>e.g.</u> bare cells or extensive use of isolation for psychotic detainees).

5.   The Jail should include mental health staff and administrators as part of medical quality assurance and other administrative management processes.

C.  <u>Protection from Harm</u>

1.   The Jail should ensure that there are a sufficient number of adequately trained staff on duty to supervise detainees and to respond to serious incidents.

2.   The Jail should prohibit the use of chokeholds and hogtying.

3.   The Jail should increase video surveillance in critical housing areas and alter staffing patterns to provide additional direct supervision of housing units.

4.   The Jail should develop and implement policies and procedures to improve control over razors or other dangerous items.

5.   The Jail should develop and implement additional policies and procedures for the investigation of serious incidents, including excessive use of force and detainee-on-detainee violence.  These policies and procedures should include administrative responses to violence and a detainee disciplinary process conducted in a confidential manner. They should also include routine interview and document

collection procedures that will allow investigators to complete their inquiries in an objective manner consistent with generally accepted correctional standards.

6.  The Jail should alter its procedures for cell extractions and other use of force situations to ensure that staff are utilizing appropriate force techniques.  Such alterations should include routine videotaping of planned use of force.

D.  <u>Sanitation and Life Safety</u>

1.  The Jail should develop and implement a long-term plan for addressing Jail crowding and population growth.

2.  The Jail should develop and implement policies and procedures to improve detainee hygiene to a level consistent with generally accepted health standards.  The Jail should specifically improve laundry practices and facilities to ensure that the Jail can adequately wash and sanitize detainee laundry.  The Jail should also maintain, at all times, a sufficient supply of sanitary bedding, linen, clothing, razors, and other hygiene materials.

3.  The Jail should increase staff training to ensure that staff is prepared to implement emergency procedures and operate emergency equipment the event of an emergency.  Jail supervisors shall periodically test and drill staff on their knowledge of emergency procedures, and provide corrective instruction as part of a Jail-wide safety program.  The Jail should continue with its ongoing effort to develop a qualified Jail safety team to help conduct staff training and oversee facility safety programs.

* * * * * * * * * * * * * * * *

Please note that this findings letter is a public document. It will be posted on the Civil Rights Division's website.  While we will provide a copy of this letter to any individual or entity upon request, as a matter of courtesy, we will not post this letter on the Civil Rights Division's website until ten calendar days from the date of this letter.

We hope to continue working with the County in an amicable and cooperative fashion to resolve our outstanding concerns regarding the Jail.  Since we toured, the County has reported that it has adopted a number of improvements, many of which appear to be designed to address issues raised during our exit interviews.  We appreciate the County's pro-active efforts.

Assuming there is continued cooperation from the County and the Jail, we would be willing to send our consultants' reports under separate cover. These reports are not public documents. Although the consultants' evaluations and work do not necessarily reflect the official conclusions of the Department of Justice, their observations, analysis, and recommendations provide further elaboration of the issues discussed in this letter and offer practical technical assistance in addressing them.

We are obligated to advise you that, in the event that we are unable to reach a resolution regarding our concerns, the Attorney General may initiate a lawsuit pursuant to CRIPA to correct deficiencies of the kind identified in this letter 49 days after appropriate officials have been notified of them. 42 U.S.C. § 1997b(a)(1).

We would prefer, however, to resolve this matter by working cooperatively with you and are confident that we will be able to do so in this case. The lawyers assigned to this investigation will be contacting the County's attorney to discuss this matter in further detail. If you have any questions regarding this letter, please contact Shanetta Y. Cutlar, Chief of the Civil Rights Division's Special Litigation Section, at (202) 514-0195.

Sincerely,

*/s/ Loretta King*

Loretta King
Acting Assistant Attorney General

cc: Vince Ryan, Esq.
Harris County Attorney

Adrian Garcia
Sheriff
Harris County

The Honorable Tim Johnson, Esq.
United States Attorney
Southern District of Texas