# EXHIBIT 3

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ESTATE OF KENNETH | § | |
| ANDERSON, JR., KENNETH DARIUS | § | |
| ANDERSON, KRISTEN SANDOVAL, | § | |
| INDIVIDUALLY, | § | |
| A/N/F OF N.B.A. AND N.K.A., AND | § | |
| ALL WRONGFUL DEATH | § | |
| BENEFICIARIES OF | § | |
| KENNETH ANDERSON JR. | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:21-cv-3730 |
| | § | |
| HARRIS COUNTY, TEXAS, HARRIS | § | |
| COUNTY SHERIFF'S OFFICE, | § | |
| CRISTAL ESTRADA, INDIVIDUAL | § | |
| OFFICERS 1-10, AND INDIVIDUAL | § | |
| EMPLOYEES 1-10 | § | |
| | § | |
| *Defendants.* | § | JURY TRIAL DEMANDED |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

> This is a case of a tragic denial of medical and mental health care desperately needed by Kenneth Anderson, Jr. Deputies intentionally tased Mr. Anderson immediately after he had been in a single vehicle accident, resulting in his atrocious death. Medical aid was not provided to him until more than 20 minutes after Mr. Anderson was clearly nonresponsive. Harris County policies, practices, and customs resulted in Mr. Anderson not receiving required medical and mental health care after he was drive-stunned. He never should have been tased in the first place. Defendants' deliberate indifference and objective unreasonableness caused Mr. Anderson to suffer unnecessary injury and mental anguish before his death in the custody of Harris County and its Deputies.

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COME NOW, Plaintiffs, Estate of Kenneth Anderson, Jr., Kenneth Darius Anderson and Kristen Sandoval, a/n/f of N.B.A. and N.K.A. ("Plaintiffs"), and file this PLAINTIFFS' FIRST AMENDED COMPLAINT, complaining of HARRIS COUNTY, TEXAS, MOHANAD ALOBAIDI, CRISTAL ESTRADA, VICTOR PAGE, AND MERCY GARCIA (collectively, "Defendants"), and for cause of action would respectfully show this Honorable Court the following:

## I. DISCOVERY

1.    Plaintiffs intend for discovery to be conducted under the Court's scheduling order and Rules 26 to 37 and Rule 45 of the Federal Rules of Civil Procedure.  This case involves complex issues and will require extensive discovery.  Therefore, Plaintiffs ask the Court to order that discovery be conducted in accordance with a discovery plan tailored to the particular circumstances of this suit.

## II.  INTRODUCTORY ALLEGATIONS

### A.      PARTIES

2.    Plaintiff Estate of Kenneth Anderson, Jr. is represented by Plaintiff Kenneth Darius Anderson. Kenneth Anderson, Jr. was a natural person who resided in, was domiciled in, was a citizen of, and who died in the State of Texas.

3.    Plaintiff Kenneth Darius Anderson ("Kenneth Darius") is a natural person who resides in, was domiciled in, and is a citizen of Texas at all relevant times. Kenneth Darius is the son of Kenneth Anderson, Jr.

4.    Plaintiff Kristen Sandoval, As Next Friend of N.B.A., a Minor, is a natural person who is the mother of N.B.A. and who resides in Houston, Harris County, Texas. N.B.A. is the child of Kenneth Anderson, Jr.

5.    Plaintiff Kristen Sandoval as Trustee of the proposed N.B.A. Trust, as requested in these pleadings.  Kristen is specifically requesting that all recovery allowed by all factfinders including the jury, for this Plaintiff, be placed in a trust or similar instrument solely for the benefit of N.B.A.

6.     Plaintiff Kristen Sandoval, As Next Friend of N.K.A., a Minor, is a natural person who is the mother of N.K.A. and who resides in Houston, Harris County, Texas. N.K.A. is the child of Kenneth Anderson, Jr.

7.     Plaintiff Kristen Sandoval as Trustee of the proposed N.K.A. Trust, as requested in these pleadings.  Kristen is specifically requesting that all recovery allowed by all factfinders including the jury, for this Plaintiff, be placed in a trust or similar instrument solely for the benefit of N.K.A.

8.     Defendant Harris County, Texas ("Harris County") is a Texas County. Harris County may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer, Harris County Judge Lina Hidalgo at 1001 Preston, Ste. 911 Houston, Texas 77002 and or anywhere Defendant may be found. Service on such a person is also consistent with the manner prescribed by Texas law for serving a summons or like process on a county as a Defendant, as set forth in Texas Civil Practice and Remedies Code Section 17.024(a). Harris County acted or failed to act at all relevant times through its employees, agents, representatives, jailers, and/or chief policymakers, all of whom acted under color of State law at all relevant times, and is liable for such actions and/or failures to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act). Harris County's policies, practices, and/or customs were moving forces behind constitutional violations, and resulting damages and injury, referenced and asserted in this pleading.  Defendant Harris County, Texas has already appeared in this case.

9.      Defendant, Mohanad Alobaidi ("Alobaidi"), who may be served at his residence, located at ███████████████████, Houston, TX ██████ or at 6831 Cypresswood Drive, Spring, Texas 77379. This Defendant will be referred to by his last name for all purposes throughout this Complaint.

10.     Defendant, Cristal Estrada ("Estrada"), who may be served at her residence, located at ███████████., Houston, TX ██████ or at 6831 Cypresswood Drive, Spring, Texas 77379. This Defendant will be referred to by her last name for all purposes throughout this Complaint. Defendant Estrada has already appeared in this case, and is represented by counsel.

11.     Defendant, Victor Page ("Page"), who may be served at his residence, located at ██████ ██████ Spring, TX ██████ or at 6831 Cypresswood Drive, Spring, Texas 77379. This Defendant will be referred to by his last name for all purposes throughout this Complaint.

12.     Defendant, Mercy Garcia-Fernandez ("Garcia"), who may be served at her place of work, located at 6831 Cypresswood Drive, Spring, Texas 77379. This Defendant will be referred to by his last name for all purposes throughout this Complaint.

## B.      JURISDICTION AND VENUE

13.     The Court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. § 1331 and § 1343(4) because this suit presents a federal question and seeks relief pursuant to federal statutes providing for the protection of civil rights. This suit arises under the United States Constitution (Fourth, Eighth, and Fourteenth Amendments) and the following federal statutes: 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act of 1973.

14. This Court has general personal jurisdiction over Defendants Alobaidi, Page, Garcia and Estrada because they all reside and/or work in Harris County, Texas.

15. This Court has general personal jurisdiction over Harris County because it is a political subdivision that is located within Harris County, Texas.

16. This Court has specific *in personal* jurisdiction over all Defendants because this case arises out of conduct which caused the death of Kenneth Anderson, Jr., which occurred in Harris County, Texas, within the Southern District of Texas.

17. Venue is proper in the Houston Division of the United States District Court for the Southern District of Texas, pursuant to 28 U.S.C. § 1391(b)(2). A substantial part of the events or omissions giving rise to claims in this lawsuit occurred in Harris County, which is in the Houston division of the United States District Court for the Southern District of Texas.

### III. FACTUAL ALLEGATIONS

### A.     INTRODUCTION

18. Plaintiff Estate of Kenneth Anderson, Jr., Plaintiff Kenneth Darius and Plaintiff Kristen, a/n/f of N.B.A. and N.K.A. (together referred to as "Plaintiffs" and each separately a "Plaintiff") provide in the factual allegations sections below the general substance of certain factual allegations. Plaintiffs do not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations. Rather, Plaintiffs intend that those sections provide Defendants with sufficient fair notice of the general nature and substance of Plaintiffs' allegations, and further demonstrate that Plaintiffs' claim(s) have factual plausibility. Whenever Plaintiffs plead factual allegations "upon information and belief," Plaintiffs are pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation

or discovery.

**B.** **KENNETH ANDERSON, JR.'S LIFE**

19.     Kenneth Anderson, Jr. ("Mr. Anderson") was only 42 years old when his life was cut short

by Harris County deputies. He lived near his family in Houston, Texas. Mr. Anderson is

survived by his loving mother, his caring sisters, three children (two of them minors), and

had been given the best title in the world of grandfather. Mr. Anderson was known to say

that his children were his greatest accomplishment in life. Mr. Anderson was the proud

father of Kenneth Darius who is twenty-four years old, N.B.A. who just turned six, and

N.KA. who is seven years old (collectively "the Children").




20.     Mr. Anderson was a survivor of verbal, physical, and sexual abuse inflicted upon him by

those who were meant to protect and love him unconditionally, his family members.

21.     Mr. Anderson began self-medicating for this abuse with drugs, but he survived the drug

use and worked hard to overcome addiction.

22.     He is also the survivor of not one but two shootings, one at age eleven, a tragic accident, and one where he was shot four times within the past five years.

23.     Mr. Anderson has long lived with the diagnosis of both bipolar disorder and major depressive disorder with suicidal ideations, and a misdiagnosis of schizophrenia (facts known by the Defendants before he was drive-stunned), but he survived and was thriving.

24.     The only thing he could not survive was his encounter with the Harris County Sheriff's deputies. According to at least one public source, in 2020 alone, 71 percent of individuals stunned were minorities, and 57 percent showed no signs of intoxication.  *See* James Pinkerton, *Taser Warnings Go Unheeded Among Harris County Deputies*, Hous. Chron., Jun.   27,   2011,   https://www.chron.com/news/houston-texas/article/Taser-warnings-go-unheeded-among-Harris-County-2081970.php.

### C.     KENNETH ANDERSON JR.'S DEATH WHILE IN THE CUSTODY OF HARRIS COUNTY

25.     In the early morning of October 10, 2021 ("Date of Death"), Mr. Anderson was in a single vehicle car accident at 15413 Kuykendahl Road, Houston, Texas 77014, to which Mohanad Alobaidi, Cristal Estrada, Victor Page, and Mercy Garcia (together the "Deputies") were called to assess. The Deputies were employees of the Harris County Sheriff's Office ("HCSO"), a division of Defendant Harris County.

26.     After providing requested information to Estrada, Mr. Anderson was arrested for an open Justice of the Peace warrant for a $297.70 fine for nonappearance in court for the offense of not having a driver's license. Running his information would have immediately notified the Deputies that he was also a former Mental Health Court Defendant and would need to be treated in accordance with his mental health disability which included bipolar disorder and major depressive disorder.

27.     Upon information and belief, at 4:35 a.m. on the Date of Death, Mr. Anderson (who had just had a single vehicle accident), who was unarmed, was repeatedly drive-stunned by a conducted electrical device, which repeatedly fired upwards of 50,000 volts of electricity into his body. Being tased temporarily paralyzes the nervous system and muscles.  Before and during the tasing, <u>Mr. Anderson was restrained in handcuffs and inside a patrol vehicle</u>. Deputies drive-stunned Mr. Anderson with the taser. *See Ex. 1 Custodial Death Report filed with the Tex. Off. of the Att. Gen. at 6-7, Oct. 14, 2021.* A drive-stun, according to HCSO policy, is the act of firmly pressing the front of the taser against the subject's body and "driving" it into them, when the cartridge probes have been deployed or the cartridge has been removed from the end of the device.

28.     The scene was the single vehicle car wreck involving only Mr. Anderson and no one else. Essentially, Mr. Anderson was driving a Mercedes Benz sedan, when he struck a street curb, disabling the vehicle.  It is unknown who called 911, but it likely could have been Mr. Anderson. At some unknown point, deputies took Mr. Anderson away from the scene and into a parking lot at a gas station called Faddy's. Inside the Faddy's parking lot, there was a La Ruta food truck that also had video surveillance that captured the incidents (this has not been provided to Plaintiffs' counsel either, but is in the custody of Harris County).

29.     Upon information and belief, Defendant Estrada responded to the scene of the wreck  She was not alone and there were multiple deputies at the scene. What is known is that when body worn camera ("BWC") footage starts, Mr. Anderson is peacefully handcuffed and placed into the back of Estrada's patrol vehicle before entering the Faddy's parking lot. He is clearly in the custody of Harris County. Defendant Alobaidi ran a background check on Mr. Anderson, and obtained a JIMS report on Mr. Anderson, which indicated that Mr.

Anderson was a mental health defendant. What happens next is a barrage of outrageous and baffling events that directly caused Mr. Anderson's in-custody death.

30.     Ten to fifteen minutes later, while sitting in the back of Estrada's patrol car on a hot Houston night (the vehicle was turned off), Mr. Anderson began repeatedly begging for water.  Defendant Alobaidi initially addressed Mr. Anderson by calling him a "Man Boy". Defendant Alobaidi went to his patrol vehicle and picked up his personal Chick-Fil-A drink with an unknown liquid therein, and gave same to Mr. Anderson to drink.  Mr. Anderson was very leery of drinking the unknown liquid, but complied with commands to drink same. Mr. Anderson told Alobaidi that he had taken a controlled substance earlier that night. Instead of placing Mr. Anderson back into Estrada's patrol vehicle, Deputies decided to place him into the back of Alobaidi's patrol vehicle. Mr. Anderson was still handcuffed and under the control and supervision of four deputies

31.     According to Defendant Page's BWC (only a fraction of which Plaintiffs' counsel has been permitted to see), Defendant Alobaidi threatened Mr. Anderson by yelling "I'll fucking tase you, I don't care."  According to the videotaped admissions by Defendant Alobaidi, Mr. Anderson was tased 12 times. Following his first drive-stun into Mr. Anderson's upper torso, Alobaidi again drive-stunned Mr. Anderson, this time for at least fifteen (15) seconds over a nineteen (19) second period. According to Alobaidi's BWC (which has not been provided to counsel for Plaintiffs for independent review and analysis), at approximately 4:51 a.m., Alobaidi drive-stunned Mr. Anderson for this objectively unreasonable period of time, to which Mr. Anderson repeatedly responded "I can't breathe" and "help me".

32.     Upon information and belief, Defendant Page responded to Mr. Anderson by calling him a "bitch ass N*****" a seriously inappropriate racial slur.

33.     At 4:53 a.m., still while sitting slouched over in the back of Alobaidi's patrol vehicle and clearly in medical distress, Defendant Page used a choke hold (which is a violation of his training) on Mr. Anderson to get the non-responsive Mr. Anderson to sit up inside the vehicle.  Mr. Anderson was completely incapacitated and had slumped over in the back of the vehicle.

34.     At 4:54 a.m., Mr. Anderson is heard crying out "help me" and "I can't breathe" several times. At approximately 4:55 a.m. on the BWC, Alobaidi again states that he tased Mr. Anderson 12 times.

35.     At approximately 5:04 a.m. Defendant Garcia reads Mr. Anderson the DIC-23-25 warnings and asks him does he want to give blood.  Mr. Anderson is completely unresponsive and not conscious at this point. She read the warnings to an unconscious human being.  There was no response and she didn't pursue a response or address the lack of response from Mr. Anderson.

36.     At approximately 5:08 a.m., an ambulance arrived, but the EMTs completed only a visual and cursory check on a now unresponsive Mr. Anderson.  When they asked to do a more in depth vital sign check and requested that Mr. Anderson be moved to the ambulance, Defendant Alobaidi refused to move Mr. Anderson to the ambulance at all.  There was no pulse check or medical evaluation completed, though same is required after a person is tasered.  Mr. Anderson's breathing was observed to be very labored at this point. His head slumped forward.  He was clearly in medical distress.

37.     At approximately 5:08 a.m. Sergeant Joseph Douglass also arrived at the scene to conduct a Blue Team review.  At 5:18 to 5:20 a.m., Defendant Garcia's BWC captures Sergeant Douglass lecturing and admonishing Defendants Alobaidi and Page, reminding them that

a recent memorandum issued to the deputies had warned about the dangers of drive-stunning and to "just don't do it."

38.  Mr. Anderson was not a danger to any of the Deputies present. He did not present a threat to the Deputies' safety. He was handcuffed and inside Alobaidi and Garcia's patrol vehicle. It appears from the BWC footage that Mr. Anderson did not want to be in the patrol vehicle because he could not breathe and was thirsty. Based on the BWC footage of Alobaidi, Page, Estrada, and Garcia, Mr. Anderson never attacked any of the Deputies at any point. He never tried to gain access to a weapon.  He never charged the deputies.  He never ran. He never cursed at the deputies. He never did any action to endanger any of the Deputies. Nevertheless, he was drive-stunned repeatedly until he was obviously unconscious and completely nonresponsive. No reasonable medical aid was rendered and he was specifically denied care by Alobaidi at the scene of the tasing even though he was nonresponsive. Mr. Anderson was transported to the Harris County Joint Processing Center ("JPC") by Alobaidi and Garcia.

39.  When Alobaidi and Garcia arrived at the JPC at approximately 5:47 a.m., Mr. Anderson was still nonresponsive. At this point, Garcia questioned whether he was alive while he was still in the vehicle. When Mr. Anderson failed to answer any questions from Alobaidi and Garcia, they pulled him out of the vehicle. At 5:53 a.m., Garcia asks if an EMS should be called.  Then Alobaidi strolls into the JPC. At 5:57 a.m., medical equipment is brought from the JPC to Mr. Anderson, and compressions begin soon thereafter.  EMS does not arrive to the JPC until approximately 6:09 a.m.

40.  Upon information and belief, Mr. Anderson was already dead when he was pulled from Alobaidi's patrol vehicle at the JPC. He had died while in custody during transit to the JPC

while in Alobaidi and Garcia's patrol vehicle. Defendant Harris County has yet to provide Plaintiffs with the autopsy results.

41.   This horrible and excessive force against Mr. Anderson was not only excessive, unnecessary and unreasonable, but directly and in fact caused his horrific death.

42.   Upon information and belief, Mr. Anderson was pronounced dead at approximately 7:28 a.m. at St. Joseph Medical Center, never having left the custody of Harris County employees. See *Ex. 1 at 7*. Mr. Anderson is now one of the over 500 deaths caused by tasers since 2010. Jo Ciavaglia, Josh Salman and Katie Wedel, *Lethal Force? Tasers Are Meant To Save Lives, Yet Hundreds Die After Their Use By Police*, USA TODAY NETWORK, April 26, 2021, https://www.usatoday.com/in-depth/news/investigations/2021/04/23/ police-use-tasers-ends-hundreds-deaths-like-daunte-wright/7221153002/.

43.   Further, he is now one of the over 233 deaths occurring in the custody of Defendant Harris County between 2005 and 2020. *See* St. John Barned-Smith, *Man Arrested By Harris County Sheriff's Deputies Sunday Morning Dies After Collapsing Suddenly At Joint Processing Center*, HOUS. CHRON., Oct. 10, 2021, https://www.houstonchronicle.com/news/houston-texas/houston/article/Man-arrested-by-Harris-County-sheriff-s-16523284.php.

44.   Upon information and belief, an investigation into the actions surrounding the horrible death of Mr. Anderson is being investigated by the HCSO Homicide Division and Internal Affairs Divisions. At this time, no information has been provided to Plaintiffs regarding this investigation. The Harris County Coroner's Office has also completed an autopsy that has not been provided to Plaintiffs.

### IV. CAUSES OF ACTION AGAINST HARRIS COUNTY AND THE DEPUTIES

## A.     LOSS OF CONSORTIUM

45.     Plaintiff Children incorporate by reference all of the foregoing, and alleges as follows:

46.     The Texas Supreme Court has held that children may recover on a claim "for loss of consortium when a third party causes serious, permanent, and disabling injuries to their parent." *Reagan v. Vaughn*, 804 S.W.2d 463, 467 (Tex. 1990). In order to succeed on a claim for loss of consortium, the defendant must have caused physical injury to the parent "in a manner that would subject the defendant to liability." *Id.* Damages that can be recovered by the children include those for: "the loss of the parent's love, affection, protection, emotional support, services, companionship, severity of the injury to the parent and its actual effect upon the parent-child relationship, the child's age, the nature of the child's relationship with the parent, the child's emotional and physical characteristics, and whether other consortium giving relationship are available to the child." *Id.*

47.     The loss of consortium claims can encompass all violations of Mr. Anderson's rights that resulted in his death, including the constitutional, statutory, and common-law violations discussed below.

48.     At all times material to this lawsuit, Plaintiff Children were the children of the decedent, Mr. Anderson. As a direct and proximate result of the actions of all Defendants as described above, Plaintiff Children now sue all Defendants for loss of consortium, and seek redress for their injuries.

## B.     TEXAS WRONGFUL DEATH ACT

49.     Plaintiff Children incorporate by reference all of the foregoing, and alleges as follows:

50.     The Deputies acted within the scope of their office or employment under the circumstances. Thus, all Defendants are either vicariously or individually liable to Plaintiff Children under

the provisions of TEX. CIV. PRAC. & REM. CODE § 71.001 et seq., commonly known as the Texas Wrongful Death Act. TEX. CIV. PRAC. & REM. CODE §§71.001-71.004 (referred to as the "Wrongful Death Act").

51.   Such damages, which Plaintiff Children have incurred as a proximate result of Defendants' violations of Mr. Anderson's constitutional, statutory, and common-law rights, are more specifically set forth below and include, but are not limited to, pecuniary loss, loss of companionship and society, loss of inheritance, grief and bereavement and mental anguish that Plaintiff Children have suffered as a result of the incident in question and will suffer in the future. Plaintiff Children are further entitled to actual and punitive damages under the Wrongful Death Act.

52.   The elements of a cause of action for wrongful death are: (1) the plaintiff is the surviving spouse, parent or child of the decedent; (2) the defendant is a person or corporation; (3) the defendant's wrongful act caused injury to the decedent; (4) the injury resulted in the death of the decedent; (5) the decedent would have been entitled to bring an action for the injury if he or she had lived; and (6) the plaintiff suffered actual injuries. *See id.*; *Russell v. Ingersoll-Rand Co.*, 841 S.W.2d 343, 345-46 (Tex. 1992).

53.   Plaintiffs Kenneth Darius Anderson, N.B.A. and N.K.A. are the children of the decedent, Mr. Anderson.

54.   Defendants are comprised of persons and entities that would qualify as proper defendants in a Wrongful Death Act suit. *City of Houston v. Stoddard*, 675 S.W.2d 280 (Tex. App.— Houston [1st Dist.] 1984) (affirming trial court decision in a Wrongful Death Act suit against the City of Houston).

55.   Mr. Anderson's suffering, injuries and death were caused by the wrongful acts or omissions

of the Deputies when they failed to provide him with adequate medical and mental health treatment.

56.     Defendants' actions caused injuries that resulted in Mr. Anderson's death.

57.     Mr. Anderson would have been entitled to bring various causes of action against Defendants had he lived through his ordeal.

58.     Mr. Anderson's children are all suffering from the trauma of having their father permanently and so suddenly and callously taken from them.

59.     A plaintiff in a wrongful death action can recover actual damages of the following four basic types: (1) pecuniary losses (e.g., loss of care, maintenance, support, services, advice and counsel); (2) mental anguish; (3) loss of companionship and society; and (4) loss of inheritance. *Moore v. Lillebo*, 722 S.W.2d 683, 687 (Tex. 1986). Punitive damages can also be recovered, but only by a surviving spouse or heirs of the decedent. *General Chemical Corp. v. De La Lastra*, 852 S.W.2d 916, 923 (Tex. 1993).

60.     Plaintiff Children are each individually entitled to bring this action pursuant to TEX. CIV. PRAC. & REM. CODE § 71.004(a), as they are each a rightful survivor of the decedent, Mr. Anderson.

## C.    SURVIVAL

61.     Plaintiffs incorporate by reference all of the foregoing, and allege as follows:

62.     The Deputies acted within the scope of their office or employment under the circumstances. Thus, all Defendants are either vicariously or individually liable to Plaintiffs through their survival action.

63.     The elements of a survival action are: (1) the plaintiff is the legal representative  or an heir of the estate of the decedent; (2) the decedent had a cause of action for personal injury to

his or her health, reputation or person before she died; (3) the decedent would have been entitled to bring a cause of action for the injury if he or she had lived; and (4) the defendant's wrongful act caused the decedent's injury. *See* TEX. CIV. PRAC. & REM. CODE §71.021; *Russell*, at 345. Exemplary damages are recoverable. *See Hofer v. Lavender*, 679 S.W.2d 470, 475 (Tex. 1984).

64.    Mr. Anderson's Children are the lawful heirs of the estate of Mr. Anderson under the statutes of descent and distribution.   *See* TEX. PROB. CODE §38 (distribution upon intestacy).   There is currently an estate administration pending. On December 8, 2021, Kenneth Darius filed an Application for Letters of Administration. The Application is pending in Probate Court No. 4 and is assigned No. 501254. Further, on December 8, 2021, Kenneth Darius filed an Application to Determine Heirship.

65.    Mr. Anderson would have had a cause of action for injuries he suffered to his health, reputation, and person.

66.    Mr. Anderson would have been entitled to bring the cause of action for the injury had he lived through his interactions with Defendants.

67.    Mr. Anderson's suffering, injuries and death were caused by the wrongful acts or omissions of the Deputies, when they used excessive force against Mr. Anderson and failed to provide him with adequate medical treatment.

68.    Defendants' actions caused the injuries that resulted in Mr. Anderson's death.

### D.    <u>NEGLIGENCE</u>

69.    Plaintiffs incorporate by reference all of the foregoing, and allege as follows:

70.    Deputies  acted within the scope of their office or employment under the circumstances. Thus, all Defendants are either vicariously or individually liable to Plaintiffs under the

Texas Tort Claims Act for negligence.

71.    Under Texas law, a claim for negligence requires that a (1) defendant owed the plaintiff a legal duty, (2) defendant breached that duty, and (3) defendant's breach proximately caused damages to the plaintiff. *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017).

72.    Defendants owed a legal duty of care to Mr. Anderson as an individual in their custody—an individual who had not even been charged or convicted of a crime.

73.    Deputies breached the duty they owed to Mr. Anderson when they tased him while restrained in handcuffs and confined to the Deputies' patrol vehicle and failed to provide reasonably timely medical care.

74.    Deputies proximately caused Mr. Anderson's injuries when they unreasonably and unjustifiably tasered him while restrained in handcuffs and already confined in the Deputies' patrol vehicle. Additionally, Deputies' ' failure to provide Mr. Anderson with reasonably timely medical care in these circumstances proximately caused Mr. Anderson's injuries and resulted in his death.

75.    Additionally, the Deputies failed to follow HCSO policies as follows:

## IV. Factors Used To Determine Reasonableness

The HCSO examines reasonableness using the objective standard established in Graham v. Connor, 490 U.S. 386 (1989). Additionally, when regarding inmates and pre-trial detainees, reasonableness "must take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." (Kingsley v. Hendrickson, 576 U.S. (2015) < https://www.supremecourt.gov/opinions/14pdf/14-6368_7lhn.pdf> )

In determining whether it is reasonable to use force, and to what degree, employees must evaluate each situation in light of the facts and circumstances of each particular case. Considerations including, but not limited to, the following may bear on the reasonableness or unreasonableness of the force used:

1. Seriousness of the crime or suspected offense if any;

2. Institutional security risk posed by the subject if any;

3. Reason for contact with the subject;

4. Whether the subject is experiencing a medical emergency that rendered him or her incapable of making a rational decision;

5. The level of threat or resistance presented by the subject;

6. The relationship between the need for the use of force and the amount of any force used;

7. Potential for injury to the subject, employee, or others;

8. An attempt by the subject to escape;

9. Time available to the employee to make a decision and his or her reasonable access to de-escalation options;

10. Proximity or access of weapons to the subject if any;

11. Whether the conduct of the subject no longer reasonably appears to pose an imminent threat to the employee or others;

12. Relative factors of age, size, strength, skill level, injury, exhaustion, and the number of employees versus the number of subjects; and

13. Environmental factors and exigent circumstances.

### A. Unreasonable Force

Unreasonable force is prohibited.

1. Once resistance is overcome or aggression is reduced, the employee must correspondingly and immediately reduce the degree of force he or she is applying, or the use of force is not reasonable.

2. Connecting hand and leg restraints of a restrained subject (i.e., hog-tying) is prohibited.

3. Using force as punishment, to interrogate, or in response to verbal provocation alone is prohibited. [*Tex. Pen. Code § 9.31(b) (1) < https://statutes.capitol.texas.gov/docs/PE/htm/PE.9.htm#62008.53343>* ]

4. Using deadly force to prevent a person from self-harm is prohibited. [*Tex. Pen. Code § 9.34(a) < https://statutes.capitol.texas.gov/Docs/PE/htm/PE.9.htm#9.34>* ]

5. Any hold impeding normal breathing or circulation of blood to the brain by applying pressure to a person's throat or neck is prohibited, unless the hold is objectively reasonable and deadly force is justified.

**B. Directed Force**

Directed force is force used under the immediate direction of any other person. When force is directed by another, the same policy applies both to the one directing the force and to the person applying the force.

**NOTE:** An employee cannot defend the use of unlawful or unreasonable force by claiming he or she was directed to use that force by another person. Each employee is responsible for the force he or she uses. Employees have the duty to intervene even when directed by another to use force. See **Section VII (A)**.

**A. De-Escalation**

An employee should use de-escalation as an alternative to a higher level of force, consistent with his or her training, whenever reasonable. An employee should allow a subject time and opportunity to submit to verbal commands before force is used, if reasonably possible, and when such delay will not compromise the safety of the employee or another, and will not result in the destruction of evidence, escape of a subject, or commission of a crime.

*See Policy 501 De-Escalation and Response to Resistance at https://hcsopolicy.com/policy/501-de-escalation-response-to-resistance/.* The Defendants failed to apply less than lethal force to Mr. Anderson and utterly failed to follow the de-escalation policies of HCSO, and thus, Harris County. Further, HCSO policy 503 Use of Conducted Electrical Device provides as follows:

▷ **Policy**

It is the policy of the Harris County Sheriff's Office (HCSO) to always attempt to de-escalate and use sound tactics in any situation where force may become necessary. In the event force becomes unavoidable, deputies shall only use the minimal amount of force necessary to overcome an immediate threat or to effectuate an arrest.

CEDs should not be seen as an all-purpose device that takes place of verbal de-escalation techniques. CEDs are not harmless, and the potential for injury can be exacerbated by inappropriate use and deployment of the device.

CEDs are deployed as additional law enforcement tools and are not intended to replace firearms or self-defense techniques. They may be used to control dangerous or violent suspects when deadly force does not appear to be justified or necessary; attempts to subdue the suspects by other conventional tactics have been, or will likely be, ineffective in the situation at hand; or there is a reasonable expectation that it will be unsafe for deputies to approach within the contact range of the subject.

*See Policy 503 Use of Conducted Electrical Devices (CED) at https://hcsopolicy.com/policy/503-use-of-conducted-electrical-weapons-cew/.* Additionally, the policy provides:

If two or more deputies are involved when a CED is deployed, the deputies shall make every effort to coordinate their actions to avoid miscommunication or jeopardizing their tactical situation. Deputies should not intentionally deploy more than one CED at a time against a subject.

When the CED is going to be deployed and when reasonable, the user should announce, "TASER! TASER!" This will provide other deputies with a warning that the CED is about to be deployed and give notification to the subject of imminent discharge.

*See id.* The policy also provides as follows:

Handcuff the subject as soon as safely possible. Immediately upon restraining the subject and in order to assist with breathing, deputies shall position the subject in an upright seated position if possible or on his or her side. As soon as it is tactically safe to do so, check the subject's vital signs (pulse and breathing) or determine any medical difficulties.  Do not allow the subject to be placed in a prone position after restraining as it could result in possible allegations of positional asphyxia. Deputies shall monitor the subject until releasing them to the Joint Processing Center (JPC) or medical personnel. **Note: Deputies should be aware that there is a higher risk of sudden death in subjects under the influence of drugs and/or exhibiting symptoms associated with excited delirium.**

Deputies should avoid attempting to control continued resistance or exertion by pinning the subject to the ground or against a solid object, using their body weight.  If body weight is needed to secure the subject, deputies should place their knee on the shoulder area of the subject. Placement of body weight on the subject's back or stomach while in the prone position may cause positional asphyxia. **NOTE: Kneeling or placement of body weight to the head and/or neck area of the subject is strictly prohibited unless deadly force is justified.**

When a deputy deploys a CED on a subject, the deputy should use the CED for one standard cycle (five seconds) and then evaluate the situation to determine if subsequent cycles are necessary. Any subsequent applications should be independently justifiable, and the risks should be weighed against other force options.   If the deputy is unable to gain and maintain control of the subject after two cycles, deputies should consider other appropriate force options to respond to the threat level presented, including the assistance of backup deputies to physically restrain the subject.

Deputies should consider that exposure to the CED for longer than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious injury to the subject and should be avoided. If more than three (3) cycles are required to control the suspect and prevent an escalation in the use of force, deputies are reminded that the risk of death significantly increases. Each Taser application must be objectively reasonable and individually justified.

*Id.* The Deputies failed to follow these policies, which proximately and in fact caused Mr.

Anderson's death.

76.    The Deputies are not entitled to qualified  immunity.[1] Their denial of reasonable medical

---

[1] The defense of qualified immunity is, and should be held to be, a legally impermissible defense. In the alternative, it should be held to be a legally impermissible defense except as applied to state actors protected by immunity in 1871 when 42 U.S.C. § 1983 was enacted. Congress makes laws. Courts do not. However, the qualified immunity defense was invented by judges. When judges make law, they violate the separation of powers doctrine of the United States Constitution. Plaintiffs respectfully makes a good faith argument for the modification of existing law, such that the court–created doctrine of qualified immunity be abrogated or limited.

The natural person Defendants cannot show that they would fall within the category of persons referenced in the second sentence of this footnote. This would be Defendants' burden if they choose to assert the alleged defense. Qualified immunity, as applied to persons not immunized

and mental health care following the Deputies' unreasonable and unjustifiable tasing and other actions and/or inaction set forth in this pleading, actually caused, proximately caused, and/or were producing causes of Mr. Anderson's suffering, injury, and horrific death. Thus, Plaintiffs are entitled to all damages permitted by law.

77.     Further, the Texas Tort Claims Act waives immunity for the negligent conduct of public servants acting within the scope of their employment if such negligence arises from use of real or tangible personal property, and if under circumstances a private person would be liable under Texas law.  See TEX. CIV. PRAC. & REM. CODE § 101.021 (1)-(2). Defendants' immunity is therefore waived because they used a patrol vehicle to deny Mr. Anderson necessary medical care and they used a taser (conducted electrical device) to injure Mr. Anderson and cause his needless death.

---

under common or statutory law in 1871, is untethered to any cognizable legal mandate and is flatly in derogation of the plain meaning and language of Section 1983. *See Ziglar v. Abassi*, 137 S. Ct. 1843, 1870-72 (2017) (Thomas, J., concurring). Qualified immunity should have never been instituted as a defense, without any statutory, constitutional, or long-held common law foundation, and it is unworkable, unreasonable, and places too high a burden on Plaintiffs who suffer violation of their constitutional rights. Joanna C. Schwartz, *The Case Against Qualified Immunity,* 93 Notre Dame L. Rev. 1797 (2018) (observing that qualified immunity has no basis in the common law, does not achieve intended policy goals, can render the Constitution "hollow," and cannot be justified as protection for governmental budgets); and William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 82 (2018) (noting that, as of the time of the article, the United States Supreme Court decided 30 qualified immunity cases since 1982 and found that defendants violated clearly established law in only 2 such cases). Justices including Justice Thomas, Justice Breyer, Justice Kennedy, and Justice Sotomayor have criticized qualified immunity. *Schwartz, supra* at 1798–99; *see*. See *also Cole v. Carson*, _ F.3d _, 2019 WL 3928715, at * 19-21, & nn. 1, 10 (5th Cir. Aug. 21, 2019) (en banc) (Willett, J., Dissenting). Additionally, qualified immunity violates the separation of powers doctrine of the Constitution. *See generally* Katherine Mims Crocker, *Qualified Immunity and Constitutional Structure*, 117 Mich. L. Rev. 1405 (2019) (*available at* https://repository.law.umich.edu/mlr/vol117/iss7/3). Plaintiffs include allegations in this footnote to assure that, if legally necessary, the qualified immunity abrogation or limitation issue has been preserved.

## E.    GROSS NEGLIGENCE

78.    Plaintiffs incorporate by reference all of the foregoing, and allege as follows:

79.    The Deputies acted within the scope of their office or employment under the circumstances. Thus, all Defendants are either vicariously or individually liable to Plaintiffs under the Texas Tort Claims Act.

80.    Under Texas law, gross negligence involves two components: "(1) [when] viewed objectively from the actor's standpoint, the act or omission complained of must involve an extreme degree of risk, considering the probability and the magnitude of the potential harm to others; and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others." *Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001).

81.    Defendants' actions involved an extreme degree of risk.  Deputies recognized the extreme degree of risk associated with tasing Mr. Anderson, who was already restrained with handcuffs and confined to the Deputies' patrol vehicle. Deputies' use of the taser on Mr. Anderson not only violated Mr. Anderson's constitutional rights, but also the HCSO's own policies on the use of tasers or conducted electrical devices. As Mr. Anderson was not a dangerous or violent suspect and the deputies had no reasonable objective or subjective expectation of harm by Mr. Anderson, the Deputies' use of the taser was unreasonable and unjustifiable. The Deputies' behavior constituted grossly negligent behavior.

82.    Further, the Deputies recognized the need for medical attention as required by policy, and care, and the mental and emotional stress their actions placed on Mr. Anderson.

83.    Following Defendants' actions or lack thereof, Mr. Anderson became unresponsive. Defendants were objectively and subjectively aware that failing to render timely medical

and necessary treatment or call for an ambulance to transport him to a hospital just blocks away, posed an extreme risk of harm to Mr. Anderson.

84.     Despite knowing this, the Deputies continued with their unreasonable decision to withhold timely medical treatment from Mr. Anderson, in clear violation of Harris County policy of how a person should be treated after being tased for an extended period of time.

85.     Mr. Anderson's suffering, injuries, and death were caused by the grossly negligent or wrongful acts or omissions of the Deputies when they failed to provide him with adequate and necessary medical treatment, following the Deputies' unreasonable and unjustifiable tasing.

86.     Through their grossly negligent actions and/or inactions, the Deputies violated their duty to provide Mr. Anderson with medical attention and care following the Deputies' unreasonable and unjustifiable tasing, which resulted in Mr. Anderson's wrongful death.

87.     The gross negligence of Harris County and the Deputies caused Mr. Anderson's injuries, suffering, and death.

88.     Defendants' actions constitute gross negligence under Texas law.

89.     Thus, Plaintiffs are entitled to all damages permitted by law.

**F.     4TH and 14th AMENDMENT EXCESSIVE FORCE/UNREASONABLE SEIZURE CLAIMS UNDER 42 U.S.C. § 1983**

90.     Plaintiffs re-allege and incorporate by reference all proceeding paragraphs and further allege as follows:

91.     As a result of the Deputies' unreasonable and excessive use of force against Mr. Anderson by tasing him while he was restrained in handcuffs and confined to the Deputies' patrol vehicle, refusing to provide reasonable medical treatment, and refusing to timely allow for EMS to provide required medical care, directly caused Mr. Anderson's serious injuries,

suffering, and death. Deputies' actions therefore violated Mr. Anderson's Fourth Amendment right to be free from excessive force and unreasonable seizure.

92.     Mr. Anderson was drive-stunned multiple times, and at one point, drive-stunned for at least 15 seconds over a 19 second period in response to passive resistance to the Deputies' attempts to close the patrol vehicle's door. No medical aid was rendered to Mr. Anderson at the scene of the tasing even though he was nonresponsive and policy and procedure requires medical care after such an event. It was over twenty minutes later, a few minutes after Garcia and Alobaidi arrived at the JPC, did they finally question his health, and begin administering CPR. Upon information and belief, Mr. Anderson was already dead. He had died while in Alobaidi and Garcia's patrol vehicle. As a consequence, Defendants' unlawful use of deadly force against Mr. Anderson was clearly excessive and was objectively unreasonable in light of established law, and directly caused his death. Therefore, Defendants' actions violated Mr. Anderson's Fourth and Fourteenth Amendment rights to be free from use of excessive fore and any unreasonable seizure of his person.

93.     Defendant Harris County is liable to Plaintiff under 42 U.S.C. §1983 because the County's inadequate policies,  inadequate training, inadequate hiring practices and its established customs and/or practices constituted deliberate indifference to the deprivation of constitutional rights of black and minority citizens in this case and in similar prior cases, and those customs and practices served as the moving force behind Alobaidi's, Page's, Estrada's, and Garcia's use of excessive force against Mr. Anderson.

94.     As a direct and proximate result of Deputies' actions, Mr. Anderson suffered and his family continues to suffer significant injuries.  All of Mr. Anderson's children are devastated

beyond words.

## G.   ASSAULT AND BATTERY

95.   Plaintiffs re-allege and incorporate by reference all proceeding paragraphs and further alleges as follows:

96.   Under Texas law, a claim for excessive force is simply one for assault and battery. Plaintiffs allege that the Deputies, while in the course and scope of their employment with Harris County, committed several assaults upon Mr. Anderson when the Deputies intentionally, knowingly, recklessly, and/or unreasonably placed Mr. Anderson in a choke hold and tased Mr. Anderson while he was restrained in handcuffs and confined to the Deputies' patrol vehicle. Said assaultive conduct of the Deputies was committed intentionally, knowingly, recklessly and/or negligently, and was the proximate cause of the physical and emotional injuries, and wrongful death. Said injuries were the direct and immediate consequence of the Deputies' wrongful acts and a natural and direct result of the assault resulting in the damages described herein.

## H.  FAILURE TO INTERVENE IN EXCESSIVE FORCE

97.   Plaintiffs re-allege and incorporate by reference all proceeding paragraphs and further alleges as follows:

98.   Plaintiffs assert that Deputies, while in the course and scope of their employment with Harris County, viewed the excessive force used against Mr. Anderson, had time to intervene yet failed to do so.

99.   An officer may be liable under § 1983 under a theory of bystander liability where the officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Whitley v. Hanna*,

726 F.3d 631, 646 (5th Cir. 2013).

100. In *Whitley*, the Court acknowledges the theory of bystander liability for excessive force claims. *Whitley*, 726 F.3d at 646; *See Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995) (holding that an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983); *Ware v. Reed*, 709 F.2d 345, 353 (5th Cir.1983) (concluding that an "instruction on the defendant's alleged acquiescence in the unconstitutional conduct of other officers should have been given"). Other circuit courts are also in agreement that the direct use of excessive force is not required to impose liability under § 1983. *Garbacik v. Janson*, 111 Fed.Appx. 91, 94 (3rd Cir. 2004). *See also Webb v. Hiykel*, 713 F.2d 405, 408 (8th Cir.1983) (concluding that an officer has "a duty to prevent the use of ... force, even if the officers beating [the victim] were [the officer's] superiors"); *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir.1982) (concluding "that it is not necessary, in order to hold a police officer liable under § 1983, to demonstrate that the officer actively participated in striking a plaintiff"); *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir.1972) (stating that "one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge" and that this responsibility exists "as to nonsupervisory officers who are present at the scene of such summary punishment").

101. Although *Hale* most often applies in the context of excessive force claims, the 5th Circuit recognized that other constitutional violations also may support a theory of bystander liability. *Whitley v. Hanna*, 726 F.3d 631, 646 n. 11 (5th Cir. 2013)(citing *Richie v. Wharton County Sheriff's Dep't Star Team*, No. 12–20014, 2013 WL 616962, at *2 (5th

Cir. Feb. 19, 2013).

102.  Further, the Second Circuit has stated that "law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.1994); *see also Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972)("we believe it is clear that one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge.").

103.  Thus, Deputies may be liable under § 1983 under a theory of bystander liability when the officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Whitley*, 726 F.3d at 646.

104.  Specifically, Deputies Page, Garcia and Estrada failed in their duty to stop Alobaidi from drive stunning Mr. Anderson.  Deputies Alobaidi, Garcia and Estrada failed to stop or intervene when Page applied a choke hold to Mr. Anderson.  All Deputies failed to stop and intervene when Mr. Anderson was repeatedly insulted and cussed at by Page and Alobaidi while in custody.

### V. CAUSES OF ACTION AGAINST HARRIS COUNTY

### A.  4TH, 8TH, and 14THAMENDMENT *MONELL* CLAIMS UNDER 42 U.S.C. § 1983

105.  Plaintiffs re-allege and incorporate by reference all proceeding paragraphs and further alleges as follows:

106.  Plaintiffs set forth in this section of the pleading additional facts and allegations supporting *Monell* liability claims against Harris County. It is Plaintiffs' intention that all facts asserted

in this pleading relating to policies, practices, and/or customs of Harris County support such *Monell* liability claims, and not just facts and allegations set forth in this section. Such policies, practices, and customs alleged in this pleading were moving forces behind and proximately caused the constitutional violations and damages asserted herein.

107.    The Deputies acted within the scope of their office or employment under the circumstances, and thus, Harris County is subject to vicarious liability for all claims made by Plaintiffs.

108.    The conduct by the Deputies identified and described herein constituted excessive use of force in violation of the United States Constitution, as incorporated through the Fourth, Eighth, and Fourteenth Amendments. In particular, the conduct by the Deputies violated Mr. Anderson's right against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)[2]. To determine that Mr. Anderson's rights were violated requires a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.*

109.    Mr. Anderson did not pose an immediate threat to the safety of the Deputies or others, nor did he actively resist arrest or attempt to evade arrest. In fact, Mr. Anderson was already restrained by handcuffs and confined to the Deputies' patrol vehicle. The Deputies did not face an immediate threat of serious harm. Further, there is no indication that the Deputies feared for their safety in any meaningful way that might justify using the taser. In fact, Mr. Anderson was tased using the drive-stun mode, which requires the taser itself to be driven into the body of the victim. The Deputies' willingness to be in such close proximity to Mr.

---

[2] It should be noted that Defendant HCSO Policy 501 De-Escalation & Response to Resistance specifically refers to *Graham*.

Anderson, as opposed to firing the taser from a distance, demonstrates that the Deputies had no fear for their safety.

110.     Mr. Anderson was arrested because of an outstanding warrant to not appear. The importance of the governmental interests alleged do not justify tasing Mr. Anderson, who was already restrained and in the Deputies' vehicle. Thus, the balancing test described in *Graham* weighed heavily in Mr. Anderson's favor, proving that his constitutional rights were violated.

111.     Further, at all material times, all Defendants were acting under the color of state law, as agents of Harris County, thus establishing liability against Harris County for violation of Mr. Anderson's constitutional rights under *Monell. Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694  (1978)).

112.     At all material times, Deputies wore their official department uniforms and were acting within the course and scope of their duties as Harris County employees at the time they interacted with Mr. Anderson.

113.     Upon information and belief, the sole policymaker for the activities of law enforcement in Harris County at all relevant times was the Harris County Sheriff, Edward Gonzalez.

114.     Thus, Harris County had or ratified the following policies and/or practices in place while Mr. Anderson was in their custody:

- Engaging in use of excessive force on prisoners, particularly against people of color;

- Inadequate training and policies concerning de-escalation of force;

- Inadequate training and policies concerning mental impairments of prisoners;

- Inadequate training and policies concerning basic use-of-force protocols;

- Inadequate training and policies concerning the use of choke holds;

- Inadequate training and policies concerning following the best practices recommended by device manufacturers for use of a taser;

- Inadequate training and policies concerning self-defense techniques that should prevent the use of a taser;

- Inadequate training and policies addressing what constitutes a dangerous or violent suspect;

- Inadequate training and policies addressing the use of a taser on restrained individuals who have not been charged with a crime (referred to as an "Pretrial Detainee");

- Inadequate and substandard training and policies concerning the amount of times and length of use of a taser;

- Inadequate training and policies concerning medical care for unresponsive Pretrial Detainee;

- Hiring Deputies who were unqualified or known to be inappropriate for law enforcement;

- Failing to terminate Deputies despite knowledge of repeated unconstitutional, unlawful or improper conduct;

- Failure to discipline Deputies who used excessive force; and

- Encouraging escalation rather than de-escalation.

115. Harris County and the Deputies knew, when they arrested Mr. Anderson, that its personnel, policies, practices, and/or customs were such that they could not meet their constitutional obligations to prevent the use of excess force to Mr. Anderson's person or to provide

appropriate and timely medical treatment and/or mental health treatment. Harris County made decisions about policy and practice which they promulgated through their commissioners' court, sheriff, JPC administrator, and/or through such widespread practice and/or custom that such practice and/or custom became the policy of Harris County as it related to their Deputies.

116.    Several policies, practices, and/or customs at the JPC were moving forces behind, caused, were producing causes of, and/or proximately caused Mr. Anderson's suffering, injury, and death as referenced in this pleading. Harris County made deliberate decisions, acting in a deliberately indifferent and/or objectively unreasonable manner, when implementing and/or allowing such policies, practices, and/or customs to exist. Further, when Harris County implemented and/or consciously allowed such policies, practices, and/or customs, Harris County knew with certainty that the result would be serious injury, suffering, and likely death.

117.    Upon information and belief, Harris County did not have competent, well-trained, and/or appropriately supervised personnel to deal with Pretrial Detainees needing medical attention and care following being unreasonably and unjustifiably tased by Deputies.

118.    Upon information and belief, additional evidence will be adduced in this case to show that the medical services rendered by Harris County, as a whole, were incompetent and unreasonable. That evidence will include information demonstrating a general lack of care and deliberate indifference. This policy, practice, and/or custom was a moving force behind and proximately caused, or was a producing cause of, all injuries and the tragic death damages referenced in this pleading.

119.    Harris County chose to allow Deputies to use a taser on a restrained and confined, non-

dangerous and non-violent individual. These actions constituted a breach of Mr. Anderson's rights against unreasonable seizure, cruel and unusual punishment, a violation of his due process rights and his right to not be deprived by the State of life. Harris County's violations of Mr. Anderson's rights in this manner was his ultimate death sentence.

120.   The practice of using a taser on a non-dangerous individual, and most especially without using an alternative method first, together with improper de-escalation training and procedures, caused unnecessary additional injury, mental anguish, emotional distress, and the untimely death of Mr. Anderson. This policy, practice, and/or custom was a moving force behind and proximately caused, or was a producing cause of, all injuries, damages and death referenced in this pleading.

121.   Harris County knows that Deputies use excessive force disproportionately against people of color like Mr. Anderson, every year, but approve and condone these illegal uses of excessive force. Harris County has an extensive history of excessive force and abuse perpetrated by Harris County's sheriffs, a number of which are described below.

122.   In any event, each of the policies delineated above was actually known, constructively known and/or ratified by Harris County and its policymakers, including the Sheriff, and was promulgated with deliberate indifference to Mr. Anderson's rights under the United States Constitution. Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

123.   Consequently, these policies as delineated above were a moving force of Mr. Anderson's constitutional deprivations, injuries and caused his wrongful death, and the resulting injuries and damages to Plaintiffs.

**B.**    **4TH AND 14TH AMENDMENT VIOLATIONS UNDER 42 U.S.C. § 1983: FAILURE TO TRAIN**

124.    Plaintiffs re-allege and incorporate by reference all proceeding paragraphs and allege the
following:

125.    Harris County has inadequate policies of training the Deputies regarding the following
areas of law enforcement:

- The use of taser weapons;

- The use of choke holds;

- The use of de-escalation techniques;

- The use of racially charged terms;

- The use of slurs and racial slurs;

- The moving of a pre-trial detainee from one patrol vehicle to another;

- Reasonable detention procedures;

- The management and detention of those with physical injuries and/or
intoxication;

- The use of excessive and/or deadly force;

- The management, detention and/or transport of restrained individuals; and

- Preventing sudden in-custody death.

126.    Harris County 's policy of improper and inadequate training of deputies in the treatment of
detainees, the proper use of taser weapons, as well as the proper arrest and detention
procedures, particularly for those with physical injury and/or intoxication, and the use of
unreasonable and excessive force resulted in the constitutional deprivations and damages
alleged herein by Plaintiffs.

127.    As a direct cause and result of these constitutional violations by Harris County of Mr.
Anderson's rights and the injuries he incurred and his death that resulted, Plaintiffs seek all

compensation due to them under the law

### C. **4TH AND 14TH AMENDMENT VIOLATIONS UNDER 42 U.S.C. § 1983: FAILURE TO SUPERVISE**

128.   Plaintiffs re-allege and incorporate by reference all proceeding paragraphs and allege the following:

129.   Harris County has inadequate supervision of the Deputies regarding the following areas of law enforcement:

- The use of taser weapons;

- Reasonable detention procedures;

- The use of choke holds;

- The use of de-escalation techniques;

- The use of racially charged terms;

- The use of slurs and racial slurs;

- The moving of a pre-trial detainee from one patrol vehicle to another;

- The management and detention of those with physical injuries and/or intoxication;

- The use of excessive and/or deadly force;

- The management, detention and/or transport of restrained individuals; and

- Preventing sudden in-custody death.

130.   Harris County's policies of improper and inadequate supervision of deputies in the treatment of arrestees, the proper use of taser weapons, the proper arrests and detention procedures particularly for those with physical injury and/or intoxication, the use of supplemental restraints, prevention of sudden in-custody death, and the use of excessive force resulted in the constitutional deprivations and damages alleged herein by Plaintiffs.

131.   The actions and/or omissions of Harris County's policymakers and supervisors and/or the Deputies, can be characterized as supervisory encouragement or acquiescence in the use of excessive force and/or gross negligence amounting to deliberate indifference. This grossly inadequate supervision resulted from and was caused by Defendants' deliberate indifference to the rights of individuals not to be subjected to deprivation of their constitutional rights. Such inadequate supervision was a direct and proximate cause of the death of Mr. Anderson.

132.   As a direct cause and result of these Constitutional violations by Harris County of Mr. Anderson's rights and the injuries he incurred and his death that resulted, Plaintiffs seek all compensation due to them under the law.

### D.   14TH AMENDMENT DUE PROCESS CLAIMS UNDER 42 U.S.C. § 1983: OBJECTIVE REASONABLENESS PURSUANT TO KINGSLEY V. HENDRICKSON

133.   Plaintiffs re-allege and incorporate by reference all proceeding paragraphs and allege the following:

134.   In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), a pretrial detainee sued several jailers alleging that they violated the 14th Amendment's Due Process Clause by using excessive force against him. *Id*. at 2470. The Court determined the following issue: "whether, to prove an excessive force claim [under the Fourteenth Amendment's Due Process Clause], a pretrial detainee must show that the Deputies were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable." *Id.* (emphasis in original). In particular, the Court repeatedly refers to the petitioner as a "pretrial detainee". *See e.g.* at 2476 ("an objective standard is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment[.]").

135. The Court concluded that the objectively unreasonable standard was that to be used in excessive force cases, and that an officer's subjective awareness was irrelevant. *Id.* at 2470. The Court did so, acknowledging and resolving disagreement among the Circuits. *Id.* at 2471-72.

136. The Court flatly stated, "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 2472. Instead, "courts must use an objective standard." *Id.*

137. "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 2473. Thus, the Court required no *mens rea*, no conscious constitutional violation, and no subjective belief or understanding of offending police Deputies, or jailers, for an episodic claim but instead instructed all federal courts to analyze Deputies' conduct on an objective reasonability standard. Since pretrial detainees', and most certainly pretrial detainees' rights to receive reasonable medical and mental health care, to be protected from harm, and not to be punished at all, also arise under the 14th Amendment's Due Process Clause, there is no reason to apply a different standard when analyzing those rights.

138. This objective reasonableness standard is now the law of the land. In *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415 (5th Cir. 2017), the Fifth Circuit Court of Appeals considered appeal of a pretrial detainee case in which the pretrial detainee alleged failure-to-protect and failure to provide reasonable medical care claims pursuant to 42 U.S.C. §1983. *Id.* at 418. The court wrote, "Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment." *Id.* at 419 (internal citations omitted). The Fifth Circuit determined, even though *Kingsley* had been decided by the United States Supreme Court, that a plaintiff in such a case still must show subjective deliberate indifference by a defendant in an episodic act or omission case. *Id.* at 419-20. A plaintiff

must still show that actions of such an individual person acting under color of state law were "reckless." *Id.* at 420 (citation omitted). However, concurring Circuit Judge Graves dissented to a footnote in which the majority refused to reconsider the deliberate indifference, subjective standard, in the Fifth Circuit. *Id.* at 420 and 424-25.[3]

139.   Thus, an objective unreasonableness standard, with no regard for the Deputies' or jailers'

---

[3] Circuit Judge Graves wrote: "I write separately because the Supreme Court's decision in *Kingsley v. Hendrickson*, —— U.S. ——, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015), appears to call into question this court's holding in *Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996). In *Kingsley*, which was an excessive force case, the Supreme Court indeed said: "Whether that standard might suffice for liability in the case of an alleged mistreatment of a pretrial detainee need not be decided here; for the officers do not dispute that they acted purposefully or knowingly with respect to the force they used against *Kingsley*." *Kingsley*, 135 S.Ct. at 2472. However, that appears to be an acknowledgment that, even in such a case, there is no established subjective standard as the majority determined in *Hare*. Also, the analysis in *Kingsley* appears to support the conclusion that an objective standard would apply in a failure-to-protect case. *See id.* at 2472–2476.

Additionally, the Supreme Court said:

We acknowledge that our view that an objective standard is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment may raise questions about the use of a subjective standard in the context of excessive force claims brought by convicted prisoners. We are not confronted with such a claim, however, so we need not address that issue today. *Id.* at 2476. This indicates that there are still different standards for pretrial detainees and DOC inmates, contrary to at least some of the language in *Hare*, 74 F.3d at 650, and that, if the standards were to be commingled, it would be toward an objective standard as to both on at least some claims.

Further, the Ninth Circuit granted en banc rehearing in *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016), after a partially dissenting panel judge wrote separately to point out that *Kingsley* "calls into question our precedent on the appropriate state-of-mind inquiry in failure-to-protect claims brought by pretrial detainees." *Castro v. County of Los Angeles*, 797 F.3d 654, 677 (9th Cir. 2015). The en banc court concluded that *Kingsley* applies to failure-to-protect claims and that an objective standard is appropriate. *Castro*, 833 F.3d at 1068–1073.

In *Estate of Henson v. Wichita County*, 795 F.3d 456 (5th Cir. 2014), decided just one month after *Kingsley*, this court did not address any application of *Kingsley*. Likewise, the two subsequent cases also cited by the majority did not address or distinguish *Kingsley*. *Hyatt v. Thomas*, 843 F.3d 172 (5th Cir. 2016), and *Zimmerman v. Cutler*, 657 Fed.Appx. 340 (5th Cir. 2016). Because I read *Kingsley* as the Ninth Circuit did and would revisit the deliberate indifference standard, I write separately."

subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment. The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and apply an objective unreasonableness standard to constitutional claims in this case. The court should not apply a subjective state of mind and/or deliberate indifference standard. The Supreme Court discarded the idea that a non-convicted plaintiff should have such a burden.

140. Defendant Harris County has conceded that Mr. Anderson was at all times relevant to this suit, a pre-trial detainee. *See* Defendant Harris County's Motion to Dismiss Plaintiffs' Original Complaint, Doc. 27 at ¶ 26, filed December 15, 2021 (hereinafter referred to as "Defendant Harris County's Motion to Dismiss").

141. Defendant Harris County has a history of excessive force abuse against individuals in Harris County including:

- Danny Ray Thomas who was unarmed and whose pants were around his ankles when he was fatally shot in the chest;

- Jaquaree Simmons, who was killed while in the Harris County Jail after Deputies used excessive force on him;

- Sheketha Holman, who was tased out of her wheelchair;

- Wayne Pratt, who was fatally tased multiple times following a minor traffic accident;

- Unidentified 16-year-old boy who was punched in the face, wrestled to the ground, and subjected to expletives being shouted in his ear;

- Herman Rochan Barnes was fatally tasered 32 times by three Harris County deputies who entered his home in October 2006;

- Ester Gonzalez, a 19-year old woman who suffers from a mental illness, was beaten while she was being apprehended; and

- An unidentified man who disclosed to HCSO that he had epilepsy and needed medical care, but instead, was taken to the Harris County jail where he was beaten and sexually assaulted.

142. Mr. Anderson was a non-convicted individual who was restrained by handcuffs, confined in a patrol vehicle, and posed no threat to Deputies when he was drive-stunned. He was not a dangerous or violent suspect that needed to be drive-stunned in order to protect the safety of an Officer or anyone else. He was a scared man in a mental health crisis that needed help. HCSO's policy 503-Use of Conducted Electrical Devices was violated by Deputies when they used the taser in drive-stun mode against Mr. Anderson, killing him.

143. The Deputies acted within the scope of their office or employment under the circumstances, and thus, Harris County are subject to vicarious liability for all claims made by Plaintiffs.

144. Mr. Anderson suffered from excessive force which ultimately resulted in his wrongful death. The Deputies' conduct was objectively unreasonable and violated Mr. Anderson's rights under the 14th Amendment's Due Process Clause. This violation was a moving force of Mr. Anderson's constitutional deprivations, injuries and caused his wrongful death and the resulting injuries and damages to Plaintiffs.

### E. CAUSE OF ACTION AGAINST HARRIS COUNTY UNDER 42 U.S.C. § 1983 FOR VIOLATION OF 14TH AMENDMENT DUE PROCESS RIGHTS TO REASONABLE MEDICAL AND/OR MENTAL HEALTH CARE, TO BE PROTECTED, AND NOT TO BE PUNISHED

145. Plaintiffs re-allege and incorporate by reference all proceeding paragraphs and allege the following:

146. In the alternative, without waiving any of the other causes of action pled herein, without

waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendants Harris County is liable to Plaintiffs pursuant to 42 U.S.C. § 1983, for violating Mr. Anderson's rights to reasonable medical care, to be protected, and not to be punished as a pretrial detainee, thus resulting in fatal injuries to Mr. Anderson, and ultimately, damages to Plaintiffs. These rights are guaranteed by the 14th Amendment to the United States Constitution. Pretrial detainees are entitled to a greater degree of medical care than convicted inmates, according to the Fifth Circuit Court of Appeals. Pretrial detainees are also entitled to protection, and also not to be punished at all since they have not been convicted of any crime resulting in their incarceration.

147.    Harris County acted or failed to act under color of state law at all times referenced in this pleading. They wholly or substantially ignored Mr. Anderson's obvious serious medical needs, and they were deliberately indifferent to those needs. They failed to protect Mr. Anderson, from further injury, mental anguish and death, along with other actions and/or inaction described in this pleading, resulting in unconstitutional punishment of Mr. Anderson. Harris County's agents were aware of the excessive risk to Mr. Anderson's health and safety and were aware of facts from which an inference could be drawn of serious harm, pain, and suffering, as well as death. Moreover, they in fact drew that inference. Through vicariously liability and theories of agency, Harris County's agents violated clearly established constitutional rights, and their conduct was objectively unreasonable in light of clearly established law at the time of the relevant incidents. These violations caused Mr. Anderson's wrongful death and Plaintiffs' resultant injuries and

damages.

148.    The Fifth Circuit Court of Appeals has made it clear that Plaintiffs need not allege the appropriate policymaker at the pleadings stage. Nevertheless, out of an abundance of caution, the sheriff of Harris County was the relevant chief policymaker over matters at issue in this case. Moreover, in addition, and in the alternative, the JPC administrator was the relevant chief policymaker over matters at issue in this case. Finally, in addition, and in the alternative, Harris County's commissioners' court was the relevant chief policymaker.

149.    Harris County were deliberately indifferent regarding policies, practices, and/or customs developed and/or used with regard to Harris County pretrial detainees with serious medical and/or mental health issues, as evidenced by allegations set forth above. Harris County also acted in an objectively unreasonable manner. Policies, practices, and/or customs referenced above, as well as the failure to adopt appropriate policies, were moving forces behind and caused violation of Mr. Anderson's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur. Harris County's relevant policies, practices, and/or customs, whether written or not, were also objectively unreasonable as applied to Mr. Anderson.

150.    Harris County's denial of reasonable medical and mental health care, and other actions and/or inaction set forth in this pleading, caused, proximately caused, and/or were producing causes of Mr. Anderson's injuries, suffering, and wrongful death, and Plaintiffs' damages as mentioned and/or referenced in this pleading.

151.    As a result of Mr. Anderson's wrongful death Plaintiffs suffered the following damages, for which they seek recovery from Harris County:

- Plaintiffs' conscious physical pain, suffering, and mental anguish;

- Plaintiffs' current and future medical expenses associated with this trauma; and

- Exemplary/punitive damages.

152.    Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Mr. Anderson's and Plaintiffs' constitutional rights. Harris County's actions and inaction showed a reckless or callous disregard of, or indifference to, Mr. Anderson's safety and the rights of both Plaintiffs and Mr. Anderson. Moreover, Plaintiffs, seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

### F.    CAUSES OF ACTION AGAINST HARRIS COUNTY FOR VIOLATION OF AMERICANS WITH DISABILITIES ACT AND REHABILITATION ACT OF 1973

153.    Plaintiffs re-allege and incorporate by reference all proceeding paragraphs and further alleges as follows:

154.    Without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Harris County is liable to Plaintiffs pursuant to the Americans with Disabilities Act ("ADA") and federal Rehabilitation Act. Deputies  acted within the scope of their office or employment under the circumstances, and thus, Harris County is subject to vicarious liability for all claims made by Plaintiffs.

155.    Upon information and belief, Harris County has been and is a recipient of federal funds. Therefore, it is covered by the mandate of the federal Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate

persons with mental and physical disabilities in their facilities, program activities, and services, and also reasonably modify such facilities, services, and programs to accomplish this purpose. Further, Title II of the ADA applies to Harris County and has the same mandate as the Rehabilitation Act. Claims under both the Rehabilitation Act and ADA are analyzed similarly.

156. The JPC is a "facility" for both the Rehabilitation Act and ADA purposes. The Center's operation comprises a program and services for Rehabilitation Act and ADA purposes.

157. Mr. Anderson is a qualified individual for purposes of the Rehabilitation Act and ADA, regarded as having a mental impairment and/or medical condition that substantially limits one or more of his major life activities—bipolar disorder and major depressive disorder. Mr. Anderson was therefore disabled.

158. Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

159. The ADA prohibits discrimination by public entities, such as Harris County. Policing and processing are a program and service provided by Harris County for ADA purposes. To establish such discrimination, a plaintiff must allege: (1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability.

160. A majority of circuits have held, for purposes of Rehabilitation Act of 1973 and ADA claims, that one may prove intentional discrimination by showing that a defendant acted

with deliberate indifference. The Fifth Circuit has, as yet declined to follow the majority view. Nevertheless, intent can never be shown with certainty. Direct and circumstantial evidence can be used to support an "intent" jury finding, and allegations in this pleading show that there is more than enough of both.

161. The Rehabilitation Act and the ADA are judged under the same legal standard.

162. Mr. Anderson was a qualified individual with a disability within the meaning of the ADA in that he had mental impairment that substantially limited one or more major life activities—here his bipolar disorder and major depressive disorder. Mr. Anderson was discriminated against by reason of his disability.

163. Upon information and belief, Deputies knew that Mr. Anderson suffered from a mental disorder. As is apparent on Alobaidi's body worn camera footage, Alobaidi is holding a report of Mr. Anderson's history. Upon information and belief, this is a JIMS report, a report compiled and produced by the Harris County Justice Information Management System ("JIMS"). This report would include his criminal history, which includes proceedings and resolution of a suit in the Felony Mental Health Court in Harris County. The Felony Mental Health Court "is designed for defendants who have been charged with a felony offense (assaultive offenses and offenses involving possession or use of a firearm will be considered on a case by case basis) and diagnosed with a serious and persistent mental illness." FELONY MENTAL HEALTH COURT PROGRAM DESCRIPTION, Harris County District Courts, Criminal Division, https://www.justex.net/Courts/Drug/MentalHealth/Default.aspx (emphasis added).

164. Further, it is apparent from the body worn camera footage that the Deputies knew that Mr. Anderson was suffering significant distress, apart and distinct from, as Defendant Harris

County described, "only…signs of intoxication[.]" Defendant Harris County's Motion to Dismiss at ¶ 28. He repeatedly asked for water, which was sparingly provided, sweated profusely, and had difficulty breathing. Further, following the repeated tasing events, three of which were in quick succession resulting in him being tased for at least 15 seconds in a 19 second period, he was not responding to questions from the Deputies, and the Deputies knew that at the very least, he was not conscious. However, the Deputies never released Mr. Anderson into the care of medical personnel, even following the tasing incident, in violation of Harris County policy.

165.   Upon information and belief, discovery in this case will show that the Deputies all neglected to provide reasonable medical care to Mr. Anderson, ultimately resulting in Mr. Anderson's wrongful death. Deputies violated Mr. Anderson's Title II protections by intentionally failing to provide him with reasonable accommodations that were needed and available to allow Mr. Anderson to receive the benefits of Harris County's programs and services.

166.   Harris County's failure and refusal to accommodate Plaintiff's mental and/or physical disabilities while in custody violated the Rehabilitation Act and the ADA. Deputies chose to first, tase Mr. Anderson, after he was already restrained using handcuffs and confined to the Deputies' patrol vehicle. Deputies had not tried a different technique to gain compliance. Ex. 1 at 6. Then, following the tasing incident, Alobaidi refused to release Mr. Anderson into the care of EMS personnel who arrived at the scene of the tasing. Defendant Page then placed Mr. Anderson in a choke hold to get him to sit up. The Deputies waited at least twenty (20) minutes, between knowing he was non-responsive, and administering CPR.  Harris County, through the Deputies, deliberately chose to deny treatment to Mr.

Anderson. Such a failure and refusal caused, proximately caused, and was a producing cause of Anderson's suffering, injury, and damages, as well as Plaintiffs' resultant suffering, injuries, and damages through resultant claims of loss of consortium, survival, and wrongful death.

167. Harris County's violations of the Rehabilitation Act and the ADA included the failure to provide services and accommodations, for Mr. Anderson's disabilities. Harris County should have accommodated Mr. Anderson by:

- Refraining from using violence against Mr. Anderson by using a taser on him, and placing him in a choke hold, even after they knew he suffered from a pronounced and judicial noticed mental illness;

- Using de-escalation tactics when Mr. Anderson's mental disabilities left him disoriented and confused;

- Providing prompt medical attention following the single car accident; and

- Providing prompt medical attention following Harris County's finding that he was unresponsive.

168. Failure to provide these reasonable accommodations was intentional and illegal discrimination under the ADA against Mr. Anderson, resulting in his death, and entitling Plaintiffs to compensatory relief.

169. These failures and refusals, which were intentional, proximately caused Plaintiff's damages. Because Mr. Anderson's death resulted from Harris County's intentional discrimination against him, Plaintiffs are entitled to the maximum amount of compensatory and exemplary damages allowed by law. Plaintiffs seek all such damages itemized in the prayer and or body in this pleading (including sections above giving appropriate and fair

notice of Plaintiffs' 42 U.S.C. § 1983 claims and resulting damages) to the extent allowed by the Rehabilitation Act and the ADA. Plaintiffs also seek reasonable and necessary attorneys' fees and other remedies afforded by those laws.

## VII. JURY DEMAND

170.   Plaintiffs demand a jury trial on all issues which may be tried to a jury.

## VIII. PRAYER

All conditions precedent to assertion of all claims herein have occurred. Plaintiffs intend to use at one or more pretrial proceedings and/or at trial all documents produced by Defendants in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act requests(s).

Mr. Anderson's life mattered. His family is devastated beyond words. For these reasons and those cited above, Plaintiffs ask that Defendants be cited to appear and answer, and that Plaintiffs be awarded damages within the jurisdictional limits of the Court and against all Defendants, jointly and severally, as legally available and applicable, for all damages referenced above and below in this pleading:

- Plaintiff's economic damages;

- Mr. Anderson's medical expenses;

- Expenses for Mr. Anderson's funeral and burial;

- Mr. Anderson's conscious pain and suffering;

- All damages authorized by all federal laws for the violations of same;

- Exemplary/punitive damages;

- Pecuniary damages;

- Damages for loss of inheritance;

- Damages for loss of companionship and society;

- Past mental anguish and emotional distress resulting from and caused by Plaintiffs' injuries;

- Future mental anguish and emotional distress resulting from and caused by Plaintiffs' injuries;

- Plaintiffs' conscious pain and suffering;

- Reasonable and necessary attorneys' fees for Plaintiffs;

- All statutory attorneys' fees through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988, the ADA, and the Rehabilitation Act;

- Court costs and all other recoverable costs;

- All costs and fees of expert witnesses for Plaintiffs;

- Court costs and all other recoverable costs;

- Prejudgment and post-judgment interest at the highest allowable rates; and

- All other relief, legal and equitable, general and special, to which Plaintiffs are entitled.

Respectfully submitted,

**EDWARDS LAW FIRM PLLC**

By:   _____
George Edwards III
State Bar No. 24055438
Fed. Id. No. 1031248
Eman Patricia Arabi Katbi
State Bar No. 24092045
Fed. Id. No. 3355458

Christine D. Herron
State Bar No. 24076435
Fed. Id. No. 3654794
602 Sawyer Street
Suite 490
Houston, Texas 77007
Phone: (713) 565-1353
Fax: (713) 583-8715
Email: george@eslawpartners.com
Email: eman@eslawpartners.com
Email: christine@eslawpartners.com
**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I certify that all counsel of record who are Filing Users of the Electronic Case Files System of the Southern District of Texas have been served a true and correct copy of the foregoing by electronic submission for filing on December 19, 2021.

George Edwards III

George Edwards III